

FILED

JAN 2 3 2004

U.S. COURT OF
FEDERAL CLAIMS

**UNITED STATES COURT OF FEDERAL CLAIMS**

SHERWYN ZEPHIER,
ADELE ZEPHIER, RODERICA
ROUSE, LLOYD B. ONE STAR,
EDNA LITTLE ELK, CHRISTINE
MEDICINE HORN and LOIS L. LONG,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

      Plaintiffs,

vs.

UNITED STATES OF AMERICA,

      Defendant.

_____/

CASE NO: 03-768 L by leave of the Judge

Judge Diane Gilbert Sypolt

### PLAINTIFFS' AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Respectfully submitted,

HERMAN & MERMELSTEIN, P.A.
Attorneys for Plaintiffs
3230 Stirling Road
Suite One
Hollywood, Florida 33021
Telephone 954/962-2200

CASE NO: 03-768 L

## A. <u>Introduction</u>

Defendant moves to dismiss both Counts of Plaintiffs' two-Count Complaint. Under Count I of the Complaint, Plaintiffs assert a right to damages pursuant to "bad men" clauses in various Treaties for physical, sexual and psychological abuse suffered at Indian boarding schools. Defendant contends that Plaintiffs have failed to exhaust their administrative remedies for relief under Count I. Plaintiffs, however, are not required here to exhaust administrative remedies because there is no administrative agency with authority to resolve their claims for money damages. In particular, the Bureau of Indian Affairs ("BIA") and the Department of the Interior appear to have no authority to grant monetary relief for a "bad men" claim. Under the authority of <u>McCarthy v. Madigan</u>, 503 U.S. 140, 112 S.Ct. 1081 (1992), administrative exhaustion is therefore unnecessary.

Under Count II of the Complaint, Plaintiffs allege a breach of trust by the Government in their supervision and control of the Indian boarding schools. Defendant contends that there is no statute or regulation which affords Plaintiffs a right to monetary damages for their claims in this Count and, hence, there is no right to relief under the Tucker Act. To the contrary, Plaintiffs have a right to monetary damages for breach of trust under the authority of <u>United States v. White Mountain</u>

1

CASE NO: 03-768 L

Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126 (2003), and United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961 (1983), ("Mitchell I") because the Government exercised complete and pervasive dominion and control over Indian boarding schools pursuant to statutes and regulations. Plaintiffs accordingly request that Defendant's Motion to Dismiss be denied in its entirety.

## B. Background

Plaintiffs bring this class action for money damages under the Tucker Act, 28 U.S.C. §1491, based upon the severe physical, sexual and psychological abuse suffered by Plaintiffs and the Plaintiff class in Indian boarding schools operated under the control of the United States Government. As set forth in the Complaint, in the late 19th Century, the Government engaged in a concerted effort to place Indian children in boarding schools. This was initially accomplished in many instances by force or coercion. (Complaint ¶ 18 & 19). The purpose of the boarding schools was to assimilate the children and obliterate their native cultures. (Id. ¶17). The children were punished by inhuman methods if they spoke their tribal languages or practiced any element of their native cultures. (Id. ¶¶23, 24, 27). While the abuse was suffered by children of all ages, it was most intense for the youngest children, ages 6-10. (Id., ¶26).

2

The Bureau of Indian Affairs ("BIA") had complete dominion and control over the placement of children, and the policies, practices and conditions at the Indian boarding schools, including those operated by churches and missions. (Complaint ¶28). By statute, the Government established the framework for the Indian boarding school system in the late 19th century. 25 U.S.C. §271 et seq. This was done in furtherance of various Treaty stipulations in which the Government assumed control of the Indian peoples' education for purposes of their "civilization." (See, e.g., Treaty with the Yankton Sioux of 1858, 11 Stat. 743, Appendix "A" hereto). By Act of March 2, 1889, Ch. 412, §10, 25 Stat. 1003, the position of Superintendent of Indian Schools was created and the Secretary of Interior granted broad discretionary authority to assign the Superintendent duties over Indian schools, which was likewise for purposes of the "advancement of the pupils therein toward civilization":

> There shall be appointed by the President, by and with the
> advise and consent of the Senate, a person of knowledge
> and experience in the management, training and practical
> education of children, to be Superintendent of Indian
> Schools, whose duty it shall be to visit and inspect the
> schools in which Indians are taught in whole or in part
> from appropriations from the United States Treasury, and
> report to the Commissioner of Indian Affairs what, in his
> judgment, are the defects, if any, in any of them, in system,
> in administration, or in means for the most effective
> advancement of the pupils therein toward civilization and

3

> self-support, and what changes are needed to remedy such
> defects as may exist, and to perform such other duties in
> connection with Indian schools as may be prescribed by the
> Secretary of the Interior.

25 U.S.C. §272 (1908).

The Report of Commissioner of Indian Affairs T.J. Morgan dated September

5, 1890, included a letter entitled "Rules for Indian Schools" sent by the Secretary of

the Interior to each newly appointment reservation Agent.  (Report reprinted in

Washburn, v. 1  *The American Indian and the United States - A Documentary*

*History,*  435, 486-500 (1973))  (hereafter referred to as the "Morgan Report")

(relevant portions of the Morgan Report concerning Indian education are set forth in

Appendix "B" hereto).    This letter sets forth the organizational hierarchy for

managerial control of the Indian boarding school system - Superintendent,

Supervisors of Education, Agents and School Superintendents - under which

extensive and pervasive control of the Indian Boarding Schools was exercised by the

United States Government.[1]

Under these regulations, the United States asserted control over, among other

things:

---

[1] Specific provisions of these Rules, particularly those relating to the policies described
in the Complaint, are set forth in Argument §III infra.

CASE NO: 03-768 L

- enrollment at the schools

- conditions of the schools

- physical welfare of the children

- discipline and punishment at the schools

- personal appearance and clothing of the children

- curfew, access and security at the schools

- curriculum, instruction, schedule and recreation

(Morgan Report at 488-495, Appendix "B" at 27-34).

The Complaint in this action sets forth two Counts.  Count I is for damages under various Treaties  entered into by the United States and ratified by Congress, which each contain a "bad men" clause.  This clause typically states as follows:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agency and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to ***reimburse the injured persons for the loss sustained***. (Emphasis added)

The allegations in the Complaint set forth acts of abuse committed upon Plaintiffs and the Plaintiff class which are compensable within the terms of these "bad men"

5

clauses. (Complaint ¶¶ 43-45). Count II of the Complaint seeks money damages for the Defendant's breach of trust in enabling and facilitating physical, sexual and psychological abuse at the Indian boarding schools, which were operated within the Government's complete dominion and control. (Complaint ¶¶ 47-50).

## C. Argument

### I. THE UNITED STATES IS NOT ENTITLED TO DISMISSAL UNDER EITHER FED.R.CIV.P. 12(b)(1) or 12(b)(6)

The United States moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The motion under Rule 12(b)(1) asserts that this Court lacks subject matter jurisdiction on the grounds that (i) Plaintiffs failed to exhaust their administrative remedies prior to filing suit on their Count I claims under Treaty "bad men" clauses; and (ii) this Court does not have jurisdiction of Plaintiffs' Count II Breach of Trust claims under the Tucker Act, 28 U.S.C. §1491(a).[2] As a preliminary matter, the Government assumes without discussion that the issue of administrative exhaustion is jurisdictional and thus subject to Rule 12(b)(1). This

---

[2] It is unclear whether Defendant is raising jurisdiction under the Tucker Act as a Rule 12(b)(1) issue with respect to both Counts I and II of the Complaint, or just Count II. There should be no question that Tucker Act jurisdiction lies under Plaintiffs' Count I claims for Treaty damages pursuant to Treaty "bad men" clauses. Tsosie v. United States, 825 F.2d 393, 401 (Fed.Cir. 1987).

assumption with respect to claims under the Treaty "bad men" clauses is incorrect.

"A statute requiring exhaustion of administrative remedies may be jurisdictional if

it is 'more than a codified requirement of administrative exhaustion' and contains

'sweeping and direct' statutory language that goes beyond a requirement that only

exhausted actions be brought." Underwood v. Wilson, 151 F.3d 292, 294 (5th Cir.

1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809 (1999) (quoting Weinberger v.

Salfi, 422 U.S. 749, 757, 95 S.Ct. 2457, 2463 (1975)). The Government relies on

Treaty language for its administrative exhaustion argument that does not come close

to such a "sweeping and direct" pronouncement. Indeed, this language is ambiguous

and confusing in application. (See §II infra). Accordingly, administrative exhaustion

would be an affirmative defense, not a jurisdictional prerequisite subject to a Rule

12(b)(1) dismissal. See Arnold v. Goetz, 245 F.Supp. 2d 527, 533-34 (S.D.N.Y.

2003) (reviewing case law on issue of administrative exhaustion as jurisdictional in

case of claim by federal prisoner).[3]

---

[3]Defendant's contention that this Court lacks Tucker Act jurisdiction over Plaintiffs'
Count II Breach of Trust claims is incorrect for the reasons set forth in Section III, infra. There
and in Appendix "A" hereto, Plaintiffs set forth the record required under Rule 12(b)(1)
demonstrating Tucker Act subject matter jurisdiction. See Tozzi v. EPA, 148 F.Supp. 2d 35, 41
(D.D.C. 2001) (noting that court may consider materials outside the pleading in deciding a Rule
12(b)(1) motion). This record consists of statutes and regulations under which the Government
exercised complete dominion and control over Indian boarding schools and their students.

Defendant also seeks a dismissal of Plaintiffs' Count II Breach of Trust claims pursuant to Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6) dismissal is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02 (1957). The allegations of the Complaint are taken as true and "all reasonable inferences are drawn in favor of the complainant." Advanced Cardiovascular Systems, Inc. v. Science Life Systems, Inc., 988 F.2d 1157 (Fed. Cir. 1993). "Dismissal is improper unless there is no reasonable view of the facts which could support the claim." Id. As set forth below, this high standard is not satisfied here.

## II. PLAINTIFFS ARE NOT REQUIRED TO EXHAUST ADMINISTRATIVE REMEDIES BECAUSE THE BIA AND DEPARTMENT OF THE INTERIOR DO NOT HAVE AUTHORITY TO AWARD MONEY DAMAGES ON "BAD MEN" CLAIMS

The United States has moved to dismiss on the grounds that Plaintiffs failed to exhaust their administrative remedies. Plaintiffs need not resort to administrative remedies, however, because the administrative agency in question lacks the authority to grant the requested relief, in this instance money damages.

Defendant relies upon the language of the "bad men" clauses in the Treaties

referenced in paragraph 13 of the Complaint, which provide that "the United States will, upon proof made to the agency and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once ... to reimburse the injured persons for the loss sustained." Defendant does not, however, make reference to any Congressional legislation or regulations of the Bureau of Indian Affairs or the Department of the Interior which implement the "bad men" clauses. In particular, there is nothing in Defendant's Motion to indicate that any Government agency or department has the authority to award money damages for a claim under a "bad men" clause.

The Supreme Court discussed exceptions to the administrative exhaustion requirement in McCarthy v. Madigan, 503 U.S. 140, 112 S.Ct. 1081 (1992). The Court noted that "[t]his Court's precedents have recognized at least three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion." 503 U.S. at 146, 112 S.Ct. at 1087. These circumstances include (i) "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action"; (ii) "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief' "; and (iii) "an administrative remedy may be

inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." Id., 503 U.S. at 146-148, 112 S.Ct. at 1087-1088 (quoting Gibson v. Berryhill, 411 U.S. 564, 575 n.14, 93 S.Ct. 1689, 1696 n.14 (1973)).

In this case, the administrative agency is not empowered to grant effective relief, and thus the second exception is applicable to preclude a dismissal for failure to exhaust administrative remedies. In McCarthy, the issue was "whether a federal prisoner must resort to the internal grievance procedure promulgated by the Federal Bureau of Prisons, pursuant to the authority of Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 308, 91 S.Ct. 1999 (1971), solely for money damages." 503 U.S. at 141, 112 S.Ct. at 1084. The Court held that the petitioner was not required to exhaust administrative remedies, in large part because "[w]e conclude that the absence of any monetary remedy in the grievance procedure also weighs heavily against imposing an exhaustion requirement." Id. 503 U.S. at 154, 112 S.Ct. at 1091. See also Reiter v. Cooper, 507 U.S. 258, 113 S.Ct. 1213 (1993) (exhaustion of administrative remedies not applicable to the petitioner's claim for reparations under the Interstate Commerce Act because the Interstate Commerce Commission did not have statutory authority to grant such monetary relief); United States v. Western

Pacific R.R. Co., 352 U.S. 59, 77 S.Ct. 161 (1956) ("'exhaustion' applies where a claim is cognizable in the first instance *by an administrative agency alone*") (emphasis supplied). In a concurrence, Justice Rehnquist made it clear that exhaustion of administrative remedies should not be required in a claim for monetary relief where the agency is not empowered to grant that relief:

> I agree with the Court's holding that a federal prisoner need not exhaust the procedures promulgated by the Federal Bureau of Prisons. My view, however, is based entirely on the fact that the grievance procedure at issue does not provide for any award of monetary damages. As a result, in cases such as this one where prisoners seek monetary relief, the Bureau's administrative remedy furnishes no effective remedy at all, and it is therefore improper to impose an exhaustion requirement.

McCarthy, 503 U.S. at 156, 112 S.Ct. at 1092. See also Barbara v. New York Stock Exchange, Inc., 99 F.3d 49, 56-57 (2d Cir. 1996) (in claim for misconduct in disciplinary proceedings conducted by the New York Stock Exchange, the Court affirmed dismissal of claims for declaratory/injunctive relief, which were within the province of the Securities and Exchange Commission, on grounds of failure to exhaust administrative remedies, but reversed the district court's dismissal of the plaintiff's claim for monetary relief because "the administrative review provisions of the [Securities] Act do not provide for money damages").

11

The Government relies upon Tsosie v. United States, 825 F.2d 393 (Fed.Cir. 1987), in support of an exhaustion requirement under a "bad men" clause. Tsosie, however, supports jurisdiction in this Court under the Tucker Act and does not otherwise compel exhaustion of administrative remedies. There, the Federal Circuit considered on interlocutory appeal the certified question of whether the Treaty "bad men" clauses had become obsolete and abandoned, and were thus unenforceable. Id. at 394-95. The Court held that such a determination was outside the scope of the judiciary; the real issue was whether the "bad men" clauses had been preempted by congressional act, or had otherwise expired by their own terms or by consent, which they had not. Id. at 401, 403. The Court also rejected the Government's argument that the claim was outside the scope of the Tucker Act, 28 U.S.C. §1491, and therefore nonjusticiable, because the Treaty stated that the decision of the Commission of Indian Affairs would be binding on the parties. The Court noted that "the Tucker Act itself, as amended in 1949, preempts a treaty restriction making claims nonjusticiable. As the 1949 acts were in relief of Indians, and removed their disabilities, the judicial reluctance to find preemption of treaty rights would not obtain." Id. at 407. Accordingly, Tsosie stands for the propositions that the Treaty "bad men" clauses are enforceable and that claims thereunder are justiciable under

CASE NO: 03-768 L

the Tucker Act.

The Government also relies upon Hebah v. United States, 428 F.2d 1334, 192 Ct. Cl. 785 (1970), Begay v. United States, 219 Ct. Cl. 599 (1979) ("Begay I"), and Begay v. United States, 650 F.2d 288, 224 Ct. Cl. 712 (1980)("Begay II"), in support of an administrative exhaustion requirement for enforcement of a "bad men" clause. All of these cases were decided before McCarthy, and none of them considered the issue of whether the BIA or the Department of the Interior had the authority to grant effective relief in the form of money damages. In Hebah, the Court noted that the petitioner "alleges that claim was made upon the Superintendent of the Wind River Indian Agency and a copy sent to the Commissioner of Indian Affairs in Washington." 428 F.2d at 1340. As a result, the administrative exhaustion issue was not before the Court and there was no need to address it. In Begay I, the issue was whether the plaintiff had given the administrative agency sufficient opportunity to decide the claim before filing suit. In Begay II, the Court dismissed the claim after the plaintiff's "multiple derilictions" in an administrative proceeding before the Department of the Interior. The dismissal was based upon a failure to exhaust

13

administrative remedies premised upon a "virtual failure to prosecute."[4] Tsosie, 825

F.2d at 402.  Accordingly, the Courts in Begay I and Begay II, like Hebah, all had

before them "bad men" claims which had been presented in some manner to the BIA

or Department of Interior, and therefore these Courts did not address or decide the

issue raised here, *to wit*, whether administrative exhaustion is necessary when the

agency does not have the authority to grant the relief sought.

The Court in Tsosie noted certain incongruities in applying the Treaty language

against "a 'bad man' of the white side."  825 F.2d at 402.  Any such incongruities

which were susceptible to an interpretation denying justiciability were rejected as

preempted by the Tucker Act.  Id.  The Court also discussed the lack of any authority

regarding the standard of review for an administrative determination of a "bad men"

claim, stating that the lower court "purports to discover a 'substantial evidence'

standard [in Begay I], but we are unable to do so."  825 F.2d at 402.  While noting

these problems of the Treaty language in practice, the Tsosie Court expressly

declined to address issues regarding the administrative review process of Treaty "bad

---

[4]Begay II is an unpublished disposition and thus has no precedential value. Tsosie, 825
F.2d at 397-98.  In any event, the issue raised herein is "matter unstated and undiscussed" in
Begay II, and thus it would not be precedential. Id.

men" claims.[5]  In particular, the Court left open the question of how the BIA or Department of Interior could "reimburse the injured persons for the loss sustained", as set forth in the Treaty language, absent the authority to do so.[6]

The authority to grant monetary relief for Treaty damages was vested in this Court under the Tucker Act. Accordingly, the only common sense reading of the Treaties is to find that this Court may adjudicate "bad men" claims in the first instance.[7]  Proceeding before the administrative agency would be an empty,

---

[5]The lower court in Tsosie had remanded for an administrative determination by the Assistant Secretary of the Interior. Because the Tsosie Court had before it a certified question in an interlocutory appeal, it chose to limit its review and not disturb the lower court's remand order or otherwise address the standard of review issue. Id. at 402. The court did not have before it and did not address the question of whether administrative exhaustion was necessary in the first instance.

[6]There does not appear to be any implementing legislation for "bad men" claims. The Bureau of Indian Affairs and Department of Interior have procedural rules for hearings and appeals generally. See 25 C.F.R. §§1.2, 2.1, et seq.; 43 C.F.R. §§ 4.5, 4.20 et seq. However, it does not appear from the applicable statutes and regulations that they would have the authority to grant monetary relief, particularly for the substantial damages claimed by Plaintiffs and the Plaintiff class, nor has the Government asserted any such authority here. Accordingly, the instant regulatory scheme is analogous to that for the federal prison system before the Court in McCarthy. In McCarthy, the Government asserted a "conversion" argument, contending that a money damages claim could be "converted" by the agency to a claim under the Federal Tort Claims Act, for which the agency was authorized to award money damages. The Court rejected this argument, holding that there was no evidence of such a "conversion" practice, and thus a money damages remedy was at best "uncertain". 503 U.S. at 140, 112 S.Ct. at 1091-92.

[7]In McCarthy, the Court notes that the issue of exhaustion is within "sound judicial discretion" unless Congress has "clearly required" exhaustion. 503 U.S. at 144, 112 S.Ct. at 1086. As discussed above, the language at issue in the Treaty "bad men" clauses is laden with ambiguity and confusion in application, and, to say the least, does not clearly require exhaustion.

meaningless exercise, serving only to cause delay and confusion.[8]  There is no

purpose or policy for the requirement of administrative exhaustion in the adjudication

of a "bad men" claim, particularly in this case.  The BIA has no particular expertise

or qualification to determine claims to monetary damages arising from child abuse.

McCarthy, 503 U.S. at 145, 112 S.Ct. at 1086 (noting that policy behind exhaustion

requirement takes on "particular force" when the agency is asked to "apply its special

expertise"); see also United Tribe of Shaunee Indians v. United States, 253 F.3d 543,

551 (10th Cir. 2001) (finding that the determination of whether a particular group of

Indians exists as a tribe requires "special agency expertise").  Indeed, such issues are

traditionally resolved in the Courts.

Additionally, the authority of the Commissioner of Indian Affairs to adjudicate

and award  damages on depredation claims  was  terminated by Congress in the 19th

century.  "Bad men" clauses appear in multiple Treaties between the United States

and various Tribes entered into in the 1860's.  (Complaint ¶¶ 12, 13).  At that time,

the system for depredation claims between Indians and whites was well established.

A "depredation" is defined as "an action of plundering, despoiling, or making

inroads."  Tsosie v. United States, 825 F.2d at 401 (quoting *Webster's Third New*

---

[8]See, e.g., discussion supra regarding standard of review.

*International Dictionary* 606 (1968)). A system of compensation for depredation claims was first created in 1796 and was "[d]esigned to prevent retaliation and preserve peace [by] provid[ing] compensation to Indians and whites suffering depredations at the hands of each other." Skogen, *Indian Depredation Claims, 1796-1920* xv (1996). Congress passed periodic Indian Intercourse Acts after 1796, which culminated in the Indian Intercourse Act of 1934. Sections 16 and 17 of that Act addressed the Indian depredation system. In Section 16, Congress directed that a white person convicted of any "crime, offense or misdemeanor" against the property of a "friendly" Indian was to be sentenced to pay the Indian twice the just value of the property, and if he were unable to pay at least the just value in full, the claim amount would then be paid to the Indian from the United States Treasury. (Appendix "C", Trade and Intercourse Act, June 30, 1834, p. 42). Section 17 of the Act provided for compensation to any "citizen or inhabitant" of the United States, for property "taken, stolen or destroyed" by Indians "belonging to any tribe in amity with the United States." (Id. p. 43) Section 17 further provided for the claim to be made to the Commissioner of Indian Affairs:

> [s]uch citizen or inhabitant, his representative, attorney, or
> agent, may make application to the proper superintendent,
> agent, or sub-agent, who, upon being furnished with the

> necessary documents and proofs, shall under the direction
> of the President, make application to the nation or tribe to
> which said Indian or Indians shall belong, for satisfaction;
> and if such nation or tribe shall neglect or refuse to make
> satisfaction in a reasonable time, not exceeding twelve
> months, it shall be the duty of such superintendent, agent,
> or sub-agent, to make return of his doings to the
> commissioner of Indian affairs, that such further steps may
> be taken as shall be proper, in the opinion of the President
> to obtain satisfaction for the injury. . . .

(Id.) If the Tribe to whom the claim was presented refused or neglected to make

payment, then the Act provided that such claim would be deducted from any annuity

due from the United States to the Tribe.  Finally, if no annuity was due to the Tribe

the amount of the claim would be paid from the United States Treasury.  (Id.)

This system was in place at the time of the subject Treaties in or about 1868.

The Commissioner of Indian Affairs had authority to hear, determine and make

payment from the Treasury on depredation claims.  The "bad men" clauses in the

subject Treaties created a degree of mutuality to the depredation system by allowing

Indians to bring their claims within the system to the Commissioner of Indian

Affairs.[9]  However, this system within the agency responsible for Indian affairs was

materially changed shortly thereafter.

---

[9]  The Treaty language, unlike the Indian Intercourse Act of 1834, did not limit claims to
property damage.

18

Although the depredation system was alien and seldom used by Indians, it was widely used by whites; by the 1860's the system was riddled with fraud and corruption, particularly in its use of Indian Tribe annuities to pay claims. (Skogen, supra, p. 90). As a result, the system was altered by Act of 1870 to terminate the authority of the Commissioner of Indian Affairs to make payment from the U.S. Treasury. (*Statutes at Large*, 41st Cong., 2d Sess. p. 360 § 4 (1870), Appendix "D", p. 46). The 1870 Act transferred control over payments of claims to Congress: "and no claims for Indian depredations shall hereafter be paid until Congress shall make special appropriation therefor; and all acts inconsistent herewith are hereby repealed." Id.

Problems with the Indian depredation system continued, however, particularly with regard to questions concerning the Commissioner of Indian Affairs' ability to determine claims fairly. (Skogen, supra, p. 124). As a result the system was altered again in the Jurisdictional Act of 1891. This Act transferred to the Court of Claims original jurisdiction over depredation claims of both Indians and whites:

> *Be it enacted* ... That in addition to the jurisdiction which now is, or may hereafter be, conferred upon the Court of Claims, said Court shall have and possess jurisdiction and authority to inquire into and finally adjudicate, in the manner provided in this act, all claims of the following

19

CASE NO: 03-768 L

classes, namely:

First. All claims for property of citizens of the United States taken or destroyed by Indians belonging to any band, tribe, or nation, in amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for.

Second. Such jurisdiction shall also extend to all cases which have been examined and allowed by the Interior Department. And also to such cases as were authorized to be examined under the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June thirtieth, eighteen hundred and eight-six, and for other purposes approved March third, eighteen hundred and eighty-five, and under subsequent acts, subject however to the limitations hereafter provided.

(Appendix "E", p. 47-48).

Accordingly, as this history demonstrates, authority that existed in the Commissioner of Indian Affairs at the time of the subject Treaties was subsequently transferred to the Court of Claims, the predecessor of this Court. Any administrative exhaustion requirement was therefore superceded and rendered moot or ineffectual by Acts of Congress in the late 19th century. This Court has jurisdiction and is the proper forum for adjudication of Plaintiffs' "bad men" claims in the first instance.

For the foregoing reasons, the exhaustion of administrative remedies should

20

CASE NO: 03-768 L

not be required for Plaintiffs' "bad men" claims.

### III. PLAINTIFFS' CLAIM FOR BREACH OF TRUST IS COGNIZABLE UNDER THE TUCKER ACT

Defendant seeks dismissal of Count II of Plaintiffs' Complaint for Breach of

Trust on the grounds that there is no basis for jurisdiction under the Tucker Act, 28

U.S.C. § 1491(a), because the Plaintiffs do not set forth a substantive right enforceable

against the United States by a claim for money damages. Plaintiffs, to the contrary,

believe that they have set forth in their Complaint a substantive right to damages for

breach of a fiduciary relationship consistent with the Supreme Court's opinions in

United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961 (1983) ("Mitchell II") and

United States v. White Mountain Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126 (2003).

Specifically, as alleged in the Complaint, the BIA exercised a level of dominion and

control over Indian children placed in the Indian Boarding School System sufficient

to establish a fiduciary relationship, the breach of which under fiduciary principles

establishes a claim for money damages. (Complaint ¶¶ 47-50).

In Mitchell II, the Court found a substantive right against the Government for

money damages for breach of a fiduciary relationship based upon certain statutes and

regulations, which "clearly give the Federal Government *full responsibility* to manage

Indian resources and land for the benefit of the Indians." Id., 463 U.S. at 224, 103 S.Ct. at 2971-72 (emphasis supplied).  The Court noted that a "fiduciary relationship necessarily arises when the Government assumes such *elaborate control* over forests and property belonging to Indians." Id., 463 U.S. at 224, 103 S.Ct at 2972 (emphasis supplied).  The Court further quoted with approval Navajo Tribe of Indians v. United States, 624 F.2d 981, 987, 224 Ct. Cl. 171, 183 (1980), which found a fiduciary relationship "where the Federal Government takes on or has *control or supervision* over tribal monies or properties ..." Id. (emphasis supplied).  Based on these "clearly establish[ed]" fiduciary obligations, the Court held that the relevant statutes and regulations "can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." Id., 463 U.S. at 226, 103 S.Ct. at 2973.  In making this holding, the Court specifically referenced the Government's special duties owed to the Indian People:

> Our construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people.  This Court has previously emphasized "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people."

Id., 463 U.S. at 225, 103 S.Ct. at 2972 (quoting Seminole Nation v. United States,

316 U.S. 286, 296, 62 S.Ct. 1049, 1054 (1942)).[10] This trust relationship extends to

the Indian peoples' liberty interests (*i.e.*, their person as opposed to their property),

as reflected in the Northwest Ordinance of 1787, which provides that "[t]he utmost

good faith shall always be observed towards the Indians, their lands and property

shall never be taken from them without their consent; and in their property, *rights and*

*liberty*, they never shall be invaded or disturbed, unless in just and lawful wars

authori[z]ed by Congress." (Emphasis supplied) (Complaint ¶12).

In White Mountain Apache, the Court reiterated the "fair inference" standard

in ruling upon the right to recover money damages in a Tucker Act claim:

> It is enough, then, that a statute creating a Tucker Act right
> be reasonably amenable to the reading that it mandates a
> right of recovery in damages. While the premise to a
> Tucker Act claim will not be "lightly inferred," 463 U.S.,
> at 218, 103 S.Ct. 2961, a fair inference will do.

123 U.S. at 1132. The Court rejected the Government's argument that there had to

be an express statutory provision for recovery of money damages to support a claim

---

[10] Mitchell II is distinguishable from United States v. Mitchell, 445 U.S. 535, 100 S.Ct.
1349 (1980) (Mitchell I"), where the Court held that a "bare trust" would not support the
inference of a money damages remedy under the Tucker Act.  In Mitchell I, in contrast to
Mitchell II, there was "no mandate that the United States manage the site on behalf of the Tribe
and thus no predicate in the statutes and regulations identified by the Tribe for finding a fiduciary
obligation enforceable by monetary relief."  White Mountain Apache, 123 S.Ct. at 1131.

under the Tucker Act:

> To the extent that the Government would demand an explicit provision for money damages to support every claim that might be brought under the Tucker Act, it would substitute a plain and explicit statement standard for the less demanding requirement of fair inference that the law was meant to provide a damages remedy for breach of a duty. To begin with, this would leave *Mitchell II* a wrongly decided case, for one would look in vain for a statute explicitly providing that inadequate timber management would be compensated through a suit for damages. But the more fundamental objection to the Government's position is that, if carried to its conclusion, it would read the trust relation out of Indian Tucker Act analysis; if a specific provision for damages is needed, a trust obligation and trust law are not.

123 S.Ct. at 1134.[11] The Court discussed the holding in <u>Mitchell II</u>, noting that it turned on the level of dominion and control exercised by the Government pursuant to statutes and regulations:

> [W]e found that statutes and regulations specifically addressing the management of timber on allotted lands raised the fair implication that the substantive obligations imposed on the United States by those statutes and regulations were enforceable by damages. The Department of the Interior possessed "comprehensive control over the

---

[11] The Government in its Memorandum supporting its Motion to Dismiss argues that this Court should not recognize a damages remedy absent a statute which "clearly sanctions one." (Defendant's Memorandum p. 11). This reflects the incorrect standard for determining the right to bring a Tucker Act claim which was rejected in <u>White Mountain Apache</u>.

> harvesting of Indian timber" and "exercise[d] literally daily supervision over [its] harvesting and management," giving it a "pervasive" role in the sale of timber from Indian lands under regulations  addressing "virtually every aspect of forest management," ... .

Id. at 1133 (citations omitted).

As set forth in the Complaint and the Appendix hereto, the United States by statutes and BIA regulations established full dominion and control over Indian children through the Indian boarding school system.  For example, in the Treaty with the Yankton Sioux of 1858, 11 Stat. 743, there is authorized a capital expenditure for school houses,

> which school or schools shall be conducted in such manner as the Secretary of the Interior shall direct.  The said Indians hereby stipulating to keep constantly thereat, during at least nine months in the year, all their children between the ages of seven and eighteen years; and if any of the parents, or other having the care of children, shall refuse or neglect to send them to school, such parts of their annuities as the Secretary of the Interior may direct, shall be withheld from them and applied as he may deem just and proper.

(Appendix "A" at 3-4).

Federal statutes provided the Secretary of the Interior, Commission of Indian Affairs and the Superintendent of Indian Schools broad authority and discretion over the

education of Indian children. See, e.g., 25 U.S.C. §§271, 272, 272a and 282. Within this discretion and authority, the Commissioner of Indian Affairs adopted detailed regulations covering every aspect of life for the Indian children in the boarding school system. (Morgan Report , Appendix "B", at 25-39).

Under these regulations, the Government's Agent was responsible for supervision of the schools. The Agent was required to periodically visit all schools on the reservation, "whether Government, contract, or mission." (Id., Morgan Report at 488, Appendix "B" at 27, ¶2). The Agent was, among other things, "expected to see that the pupils have proper moral, mental, and industrial training; that their physical welfare is properly cared for ... ." (Id., Morgan Report at 488, Appendix "B" at 27, ¶5). Directly beneath the Agent in the supervisory hierarchy under these regulations was the school Superintendent, who was given "immediate general control of the school." (Id., Morgan Report at 489, Appendix "B" at 28, ¶7). He was required to "give close personal attention to every department at the school." (Id., ¶12). The regulations provided that "all serious questions of discipline must be referred to the Superintendent." (Id., Morgan Report at 495, Appendix "B" at 34,

¶53). Further, speaking tribal languages was a recognized basis for punishment:[12]

> All instruction must be in the English language. Pupils must be compelled to converse with each other in English, and should be properly rebuked or punished for persistent violation of this rule. Every effort should be made to encourage them to abandon their tribal language.

(Id., Morgan Report at 493, Appendix "B" at 32, ¶41).

The Government's control over life at the boarding schools, in accordance with the foregoing regulations, was comprehensive and pervasive, similar to that under the statutes and regulations at issue in Mitchell II and White Mountain Apache. Also as in Mitchell II and White Mountain Apache, there is present here a fiduciary relationship between the children at the Indian boarding schools and the Government. It is well established in the common law that a fiduciary relationship is not limited to commercial dealings, "but extends to all relations in which confidence is reposed, and in which dominion and influence resulting from such confidence may be exercised by one person over another." 37 **Am. Jur. 2d**, *Fraud and Deceit* §32 (2003). The relation and duties in a fiduciary relationship "may be moral, social, domestic or personal." Id.; Clinkenbeard v. Central Southeast Oil Corp., 526 F.2d

---

[12]The proscription of speaking tribal languages was the basis for severe physical and psychological abuse at the boarding schools, as set forth in the Complaint. (See Complaint ¶¶21-23, 36 (e) and (f)).

649, 653 (5th Cir. 1976); See also Doe v. Evans, 814 So.2d 370 (Fla. 2002) (finding fiduciary duty in a counseling relationship); see also Church of Scientology Int'l v. Eli Lilly & Co., 848 F.Supp. 1018, 1028 (D.D.C. 1994); (noting that existence of fiduciary relationship is a "fact-intensive question").

The United States has previously admitted that it acted as trustee in regards to children at the Indian Boarding Schools. The trust relationship between the children at the Indian boarding schools and the United States was discussed by Kevin Gover, Assistant Secretary - Indian Affairs, Department of the Interior, in an address of September 8, 2000:

> This agency forbade the speaking of Indian languages, prohibited the conduct of traditional religious activities, outlawed traditional government, and made Indian people ashamed of who they were. Worst of all, *the Bureau of Indian Affairs committed these acts against the children entrusted to its boarding schools*, brutalizing them emotionally, psychologically, physically, and spiritually. (Emphasis supplied).

There is no conceivable basis to limit fiduciary or trust duties in the Tucker Act context to money, tangible property or commercial relations. Indeed, it would seem that the breach of a personal fiduciary relationship between the Government and children, resulting in physical and sexual abuse and consequent psychological and

emotional damages, would call for a greater level of protection and a more compelling reason to find a waiver of sovereign immunity under the Tucker Act than in commercial fiduciary relations.   Accordingly, under <u>Mitchell II</u> and <u>White Mountain Apache</u> there is a "fair inference" of a right to money damages against the United States for breach of trust based upon the pervasive control of Indian boarding schools assumed by the Government under statutes and regulations.

## D. Conclusion

Based on the foregoing, the Complaint is not subject to dismissal under either Fed.R.Civ.P. 12(b)(1) or 12 (b)(6). First, it was unnecessary for Plaintiffs to exhaust administrative remedies because the BIA and the Department of the Interior are not empowered to grant Plaintiffs monetary relief for their Count I "bad men" claims. Second, this Court has subject matter jurisdiction of Plaintiffs' Count II claims for Breach of Trust under 28 U.S.C. §1491 because the Plaintiffs' right to monetary relief is fairly inferred from the fiduciary duty owed by the Government to the Indian children given the Government's complete and pervasive dominion and control by

CASE NO: 03-768 L

statutes and regulations over the Indian boarding schools. Plaintiffs therefore request

that Defendant's Motion be denied in its entirety.

Respectfully submitted,

HERMAN & MERMELSTEIN, P.A.
3230 Stirling Road, Suite One
Hollywood, Florida 33021
www.hermanlaw.com
Telephone: 954.962.2200
Facsimile: 954.962.4292

By: _____

Jeffrey M. Herman
Florida Bar No. 521647
Stuart S. Mermelstein
Florida Bar No. 947245

CASE NO: 03-768 L

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via **Federal Express** on January 16, 2004, to: Caroline M. Blanco, Esquire, Department of Justice, Environmental and Natural Resources Division, General Litigation Section, Post Office Box 663, Washington, D.C. 20044-0663.

L:\DOCS\Clients\INDIANCLAIMS\plea\amended memo points.wpd

# UNITED STATES COURT OF FEDERAL CLAIMS

SHERWYN ZEPHIER,
ADELE ZEPHIER, RODERICA
ROUSE, LLOYD B. ONE STAR,
EDNA LITTLE ELK, CHRISTINE
MEDICINE HORN and LOIS L. LONG,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

vs.

UNITED STATES OF AMERICA,

        Defendant.

_____/

CASE NO: 03-768 L

Judge Diane Gilbert Sypolt

## APPENDIX TO
## PLAINTIFFS' AMENDED SUPPLEMENTAL
## MEMORANDUM OG POINTS AND
## AUTHORITIES IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

# INDEX TO APPENDIX

**Page**

**APPENDIX A**

Treaty with the Yankton Sioux, 1858 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**APPENDIX B**

Report of Commissioner of Indian Affairs T.J. Morgan,
September 5, 1890 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**APPENDIX C**

Trade and Intercourse Act, June 30, 1834 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**APPENDIX D**

*Statutes at Large*, 41st Cong., 2d Sess., p. 360 (1870). . . . . . . . . . . . . . . . . . . . . 46

**APPENDIX E**

Jurisdictional Act of 1891 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# APPENDIX "A"

Case 1:03-cv-00768-DGS    Document 27    Filed 01/23/04    Page 36 of 89
Page 1 of 8

INDIAN AFFAIRS: LAWS  ND TREATIES. TREATY WITH THE  ANKTON SIOU...

# TREATY WITH THE YANKTON SIOUX, 1858.

## Apr. 19, 1858. | 11 Stat., 743. | Ratified Feb. 16, 1859. | Proclaimed Feb. 26, 1859.

*Indian Affairs: Laws and Treaties*. Vol. II (Treaties). Compiled and edited by Charles J. Kappler. Washington: Government Printing Office, 1904.

Home | Disclaimer & Usage | Table of Contents | Index

Vol. II, Pages 776-781 | Page 777 | Page 778 | Page 779 | Page 780 | Page 781

Vol. II, Page images | Page 776 | Page 777 | Page 778 | Page 779 | Page 780 | Page 781

## Margin Notes:

Lands relinquished to the United States, except, etc.
Boundaries of land ceded.
Islands in the Missouri River.
Title.
Necessary roads may be built across the lands reserved, paying damages therefor.
Indians to settle etc.. on reservation within a year.
Agreements on part of the United States.
Protection on the reserved lands.
Payment of annuities.
Subsistence.
Purchase of stock, etc.
Schools and school-houses.
Indians to furnish apprentices for mills, etc.
President may discontinue allowance for school.
United States to furnish mills, mechanic shops, etc.
Mills, etc.. not to be injured.
If injured value to be deducted from annuity.
Houses, etc.. to be given to the Indians when, etc.
Portion of annuities may be paid for debts, etc.
Proviso.
Proviso.
Grants of land to Charles F. Picotte, Zephyr Rencontre, Paul Dorian, and others.
Persons other than Indians or mixed bloods may enter 160 acres at $1.25 per acre.
Yankton to be secure in the use of the red pipestone quarry.
United States may maintain military posts, etc.
No trade with Indians unless licensed.
Land not to be alienated except, etc.
The Yankton to preserve friendly relations.
Surrender of offenders.
Tribal annuities to be withheld if intemperate, etc.
Annuities not to be subject to debts, except, etc.
Release of all demands, etc.
Indian agent for Yankton.
Expenses hereof to be borne by the United States.
When to take effect.

*Articles of agreement and convention made and concluded at the city of Washington, this nineteenth day of April, A. D. one thousand eight hundred and fifty-eight, by Charles E. Mix, commissioner on the part of the United States, and the following-named chiefs and delegates of the Yancton tribe of Sioux or Dacotah Indians, viz:*
*Pa-la-ne-a-oa-pe. the man that was struck by the Ree.*

1

*Ma-to-sa-be-che-a, the smutty bear.*
*Charles F. Picotte, Eta-ke-cha.*
*Ta-ton-ka-wete-co, the crazy bull.*
*Pse-cha-wa-kea, the jumping thunder.*
*Ma-ra-ha-ton, the iron horn.*
*Mombe-kah-pah, one that knocks down two.*
*Ta-ton-ka-e-yah-ka, the fast bull.*
*A-ha-ka-ma-ne, the walking elk.*
*A-ha-ka-na-zhe, the standing elk.*
*A-ha-ka-ho-che-cha, the elk with a bad voice.*
*Cha-ton-wo-ka-pa, the grabbing hawk.*
*E-ha-we-cha-sha, the owl man.*
*Pta-son-wa-kan-na-ge, the white medicine cow that stands.*
*Ma-ga-scha-che-ka, the little white swan.*
*Oke-che-la-wash-ta, the pretty boy.*
*(The three last names signed by their duly-authorized agent and rep- resentative, Charles F. Picotte,) they being thereto duly authorized and empowered by said tribe of Indians.*

ARTICLE 1.

The said chiefs and delegates of said tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof, situated and described as follows, to wit—Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending up the Missouri River thirty miles: thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres. They, also, hereby relinquish and abandon all claims and complaints about or growing out of any and all treaties heretofore made by them or other Indians, except their annuity rights under the treaty of Laramie, of September 17, A. D. 1851.

ARTICLE 2.

The land so ceded and relinquished by the said chiefs and delegates of the said tribe of Yanctons is and shall be known and described as follows, to wit—
"Beginning at the mouth of the Tchan-kas-an-data or Calumet or Big Sioux River; thence up the Missouri River to the mouth of the Pa-hah-wa-kan or East Medicine Knoll River; thence up said river to its head; thence in a direction to the head of the main fork of the Wan-dush-kah-for or Snake River; thence down said river to its junction with the Tchan-san-san or Jaques or James River; thence in a direct line to the northern point of Lake Kampeska; thence along the northern shore of said lake and its outlet to the junction of said outlet with the said Big Sioux River; thence down the Big Sioux River to its junction with the Missouri River."
And they also cede and relinquish to the United States all their right and title to and in all the islands of the Missouri River, from the mouth of the Big Sioux to the mouth of the Medicine Knoll River.
And the said chiefs and delegates hereby stipulate and agree that all the lands embraced in said limits are their own, and that they have full and exclusive right to cede and relinquish the same to the United States.

[*777]

### ARTICLE 3.

The said chiefs and delegates hereby further stipulate and agree that the United States may construct and use such roads as may be hereafter necessary across their said reservation by the consent and permission of the Secretary of the Interior, and by first paying the said Indians all damages and the fair value of the land so used for said road or roads, which said damages and value shall be determined in such manner as the Secretary of the Interior may direct. And the said Yanctons hereby agree to *remove* and *settle* and *reside* on said reservation within one year from this date, and, until they do so remove, (if within said year,) the United States guarantee them in the quiet and undisturbed possession of their present settlements.

### ARTICLE 4.

In consideration of the foregoing cession, relinquishment, and agreements, the United States do hereby agree and stipulate as follows, to wit:

1st. To protect the said Yanctons in the quiet and peaceable possession of the said tract of four hundred thousand acres of land so reserved for their future home, and also their persons and property thereon during good behavior on their part.

2d. To pay to them, or expend for their benefit, the sum of sixty- five thousand dollars per annum, for ten years, commencing with the year in which they shall remove to, and settle and reside upon, their said reservation—forty thousand dollars per annum for and during ten years thereafter—twenty-five thousand dollars per annum for and during ten years thereafter—and fifteen thousand dollars per annum for and during twenty years thereafter: making *one million and six hundred thousand dollars in annuities in the period of fifty years*, of which sums the President of the United States shall, from time to time, determine what proportion shall be paid to said Indians, in cash, and what proportion shall be expended for their benefit, and, also, in what manner and for what objects such expenditure shall be made, due regard being had in making such determination to the best interests of said Indians. He shall likewise exercise the power to make such provision out of said sums as he may deem to be necessary and proper for the support and comfort of the aged or infirm, and helpless orphans of the said Indians. In case of any material decrease of said Indians, in number, the said amounts may, in the discretion of the President of the United States, be diminished and reduced in proportion thereto— or they may, at the discretion of the President of the United States, be discontinued entirely, should said Indians fail to make reasonable and satisfactory efforts to advance and improve their condition, in which case, such other provisions shall be made for them as the President and Congress may judge to be suitable and proper.

3d. In addition to the foregoing sum of one million and six hundred thousand dollars as annuities, to be paid to or expended for the benefit of said Indians, during the period of fifty years, as before stated, the United States hereby stipulate and agree to expend for their benefit the sum of fifty thousand dollars more, as follows, to wit: Twenty-five thousand dollars in maintaining and subsisting the said Indians during the first year after their removal to and permanent settlement upon their said reservation; in the purchase of stock, agricultural implements, or other articles of a beneficial character, and in breaking up and fencing land; in the erection of houses, store-houses, or other needful buildings, or in making such other improvements as may be necessary for their comfort and welfare.

4th. To expend ten thousand dollars to build a school-house or school-houses, and to establish and maintain one or more normal-labor schools (so far as said sum will go) for the education and training of the children of said Indians in letters, agriculture, the mechanic arts, and housewifery, which school or schools shall be managed and conducted in such manner as the Secretary of the Interior shall direct. The said

[*778]

Indians hereby stipulating to keep constantly thereat, during at least nine months in the year, all their children between the ages of seven and eighteen years; and if any of the parents, or others having the care of children, shall refuse or neglect to send them to school, such parts of their annuities as the Secretary of the Interior may direct, shall be withheld from them and applied as he may deem just and proper; and such further sum, in addition to the said ten thousand dollars, as shall be deemed necessary and proper by the President of the United States, shall be reserved and taken from their said annuities, and applied annually, during the pleasure of the President to the support of said schools, and to furnish said Indians with assistance and aid and instruction in agricultural and mechanical pursuits, including the working of the mills, hereafter mentioned, as the Secretary of the Interior may consider necessary and advantageous for said Indians; and all instruction in reading shall be in the English language. And the said Indians hereby stipulate to furnish, from amongst themselves, the number of young men that may be required as apprentices and assistants in the mills and mechanic shops, and at least three persons to work constantly with each white laborer employed for them in agriculture and mechanical pursuits, it being understood that such white laborers and assistants as may be so employed are thus employed more for the instruction of the said Indians than merely to work for their benefit; and that the laborers so to be furnished by the Indians may be allowed a fair and just compensation for their services, to be fixed by the Secretary of the interior, and to be paid out of the shares of annuity of such Indians as are able to work, but refuse or neglect to do so. And whenever the President of the United States shall become satisfied of a failure, on the part of said Indians, to full fill the aforesaid stipulations, he may, at his discretion, discontinue the allowance and expenditure of the sums so provided and set apart for said school or schools, and assistance and instruction.

5th. To provide the said Indians with a mill suitable for grinding grain and sawing timber; one or more mechanic shops, with the necessary tools for the same; and dwelling-houses for an interpreter, miller, engineer for the mill, (if one be necessary,) a farmer, and the mechanics that may be employed for their benefit, and to expend therefor a sum not exceeding fifteen thousand dollars.

### ARTICLE 5.

Said Indians further stipulate and bind themselves to prevent any of the members of their tribe from destroying or injuring the said houses, shops, mills, machinery, stock, farming-utensils, or any other thing furnished them by the Government, and in case of any such destruction or injury of any of the things so furnished, or their being carried off by any member or members of their tribe, the value of the same shall be deducted from their general annuity; and whenever the Secretary of the interior shall be satisfied that said Indians have become sufficiently confirmed in habits of industry and advanced in the acquisition of a practical knowledge of agriculture and the mechanic arts to provide for themselves, he may, at his discretion, cause to be turned over to them all of the said houses and other property furnished them by the United States, and dispense with the services of any or all persons herein before stipulated to be employed for their benefit, assistance, and instruction.

### ARTICLE 6.

It is hereby agreed and understood that the chiefs and head-men of said tribe may, at their discretion, in open council, authorize to be paid out of their said annuities such a sum or sums as may be found to be necessary and proper, not exceeding in the

aggregate one hundred and fifty thousand dollars, to satisfy their just debts and obligations, and to provide for such of their half-breed relations as do not live with them, or draw any part of the said annuities of said Indians: *Provided, however,* That their said determinations shall be approved by their agent for the time being, and the said payments authorized

[*779]

by the Secretary of the interior: *Provided, also,* That there shall not be so paid out of their said annuities in any one year, a sum exceeding fifteen thousand dollars.

## ARTICLE 7.

On account of their valuable services and liberality to the Yanctons, there shall be granted in fee to Charles F. Picotte and Zephyr Rencontre, each, one section of six hundred and forty acres of land, and to Paul Dorian one-half a section; and to the half-breed Yancton, wife of Charles Reulo, and her two sisters, the wives of Eli Bedaud and Augustus Traverse, and to Louis Le Count, each, one-half a section. The said grants shall be selected in said ceded territory, and shall not be within said reservation, nor shall they interfere in any way with the improvements of such persons as are on the lands ceded above by authority of law; and all other persons (other than Indians, or mixed-bloods) who are now residing within said ceded country, by authority of law, shall have the privilege of entering one hundred and sixty acres thereof, to include each of their residences or improvements, at the rate of one dollar and twenty-five cents per acre.

## ARTICLE 8.

The said Yancton Indians shall be secured in the free and unrestricted use of the red pipe-stone quarry, or so much thereof as they have been accustomed to frequent and use for the purpose of procuring stone for pipes; and the United States hereby stipulate and agree to cause to be surveyed and marked so much thereof as shall be necessary and proper for that purpose, and retain the same and keep it open and free to the Indians to visit and procure stone for pipes so long as they shall desire.

## ARTICLE 9.

The United States shall have the right to establish and maintain such military posts, roads, and Indian agencies as may be deemed necessary within the tract of country herein reserved for the use of the Yanctons; but no greater quantity of land or timber shall be used for said purposes than shall be actually requisite; and if, in the establishment or maintenance of such posts, roads, and agencies, the property of any Yancton shall be taken, injured, or destroyed, just and adequate compensation shall be made therefor by the United States.

## ARTICLE 10.

No white person, unless in the employment of the United States, or duly licensed to trade with the Yanctons, or members of the families of such persons, shall be permitted to reside or make any settlement upon any part of the tract herein reserved for said Indians, nor shall said Indians alienate, sell, or in any manner dispose of any portion thereof, except to the United States. Whenever the Secretary of the Interior shall direct, said tract shall be surveyed and divided as he shall think proper among said Indians, so as to give to each head of a family or single person a separate farm, with such rights of possession

or transfer to any other member of the tribe or of descent to their heirs and representatives as he may deem just.

ARTICLE 11.

The Yanctons acknowledge their dependence upon the Government of the United States, and do hereby pledge and bind themselves to preserve friendly relations with the citizens thereof, and to commit no injuries or depredations on their persons or property, nor on those of members of any other tribe or nation of of Indians; and in case of any such injuries or depredations by said Yanctons, full compensation shall, as far as possible, be made therefor out of their tribal annuities, the amount in all cases to be determined by the Secretary of the Interior. They further pledge themselves not to engage in hostilities with any other tribe or nation, unless in self-defence, but to submit, through their agent, all matters of dispute and difficulty between themselves and other Indians for the decision of the President of the United States, and to acquiesce in and abide thereby. They also agree to deliver, to the proper officer of the United States all offenders against the treaties, laws, or regulations of the United States, and to assist in discovering, pursuing, and capturing all such offenders,

[*780]

who may be within the limits of their reservation, whenever required to do so by such officer.

ARTICLE 12.

To aid in preventing the evils of intemperance, it is hereby stipulated that if any of the Yanctons shall drink, or procure for others, intoxicating liquor, their proportion of the tribal annuities shall be withheld from them for at least one year; and for a violation of any of the stipulations of this agreement on the part of the Yanctons they shall be liable to have their annuities withheld, in whole or in part, and for such length of time as the President of the United States shall direct.

ARTICLE 13.

No part of the annuities of the Yanctons shall be taken to pay any debts, claims, or demands against them, except such existing claims and demands as have been herein provided for, and except such as may arise under this agreement, or under the trade and inter-course laws of the United States.

ARTICLE 14.

The said Yanctons do hereby fully acquit and release the United States from all demands against them on the part of said tribe, or any individual thereof, except the beforementioned right of the Yanctons to receive an annuity under said treaty of Laramie, and except, also, such as are herein stipulated and provided for.

ARTICLE 15.

For the special benefit of the Yanctons, parties to this agreement, the United States agree to appoint an agent for them, who shall reside on their said reservation, and shall have set apart for his sole use and occupation, at such a point as the Secretary of the

Interior may direct, one hundred and sixty acres of land.

ARTICLE 16.

All the expenses of the making of this agreement, and of surveying the said Yancton reservation, and of surveying and marking said pipe-stone quarry, shall be paid by the United States.

ARTICLE 17.

This instrument shall take effect and be obligatory upon the contracting parties whenever ratified by the Senate and the President of the United States.
In testimony whereof, the said Charles E. Mix, commissioner, as aforesaid, and the undersigned chiefs, delegates, and representatives of the said tribe of Yancton Indians, have hereunto set their hands and seals at the place and on the day first above written.

Charles E. Mix, Commissioner. [L. S.]
Pa-la-ne-apa-pe, or the Man that was struck by the Ree, his x mark. [L. S.]
Ma-to-sa-be-che-a, or the Smutty Bear, his x mark. [L. S.]
Charles F. Picotte, or Eta-ke-cha. [L. S.]
Ta-ton-ka-wete-co, or the Crazy Bull, his x mark. [L. S.]
Pse-cha-wa-kea, or the Jumping Thunder, his x mark. [L. S.]
Ma-ra-ha-ton, or the Iron Horn, his x mark. [L. S.]
Nombe-kah-pah, or One that knocks down two, his x mark. [L. S.]
Ta-ton-ka-e-yah-ka, or the Fast Bull, his x mark. [L. S.]
A-ha-ka Ma-ne, or the Walking Elk, his x mark. [L. S.]
A-ha-ka-na-zhe, or the Standing Elk, his x mark. [L. S.]
A-ha-ka-ho-che-cha, or the Elk with a bad voice, his x mark. [L. S.]
Cha-ton-wo-ka-pa, or the Grabbing Hawk, his x mark. [L. S.]
E-ha-we-cha-sha, or the Owl Man, his x mark. [L. S.]
Pla-son-wa-kan-na-ge, or the White Medicine Cow that stands, by his duly authorized delegate and representative, Charles F. Picotte. [L. S.]
Ma-ga-scha-che-ka, or the Little White Swan, by his duly authorized delegate and representative, Charles F. Picotte. [L. S.]
O-ke-che-la-wash-ta, or the Pretty Boy, by his duly authorized delegate and representative, Chas. F. Picotte. [L. S.]

Executed in the presence of—

A. H. Redfield, agent.
J. B. S. Todd.
Theophile Bruguier.
John Dowling.
Fr. Schmidt.
John W. Wells.
D. Walker.
E. B. Grayson.
S. J. Johnson.
George P. Mapes.
H. Bittinger.
D. C. Davis.
Zephier Roncontre, his x mark, United States interpreter.

[*781]

Witness:
J. B. S. Todd,
Paul Dorain, his x mark.
Charles Rulo, his x mark.

Witness:
J. B. S. Todd.

Vol. II, Pages 776-781 | Page 777 | Page 778 | Page 779 | Page 780 | Page 781 |
Top of Treaty

Search | OSU Library Digitization Center

Produced by the Oklahoma State University Library
Generous support provided by The Coca-Cola Foundation, Atlanta, GA
URL: http://digital.library.okstate.edu/kappler/

Comments to: lib-dig@okstate.edu

# APPENDIX "B"

pita per

ed only
: schools
d Junc-
ols. The
S. Dak.:
: list. It
hool de-

primary
: lack of
nection

re camp
brought
will the

rom the
d more

in the
g those
rimary
e most
ais. No
use of

en in a
es and

e fixed.
of the
prima-

## Report of Commissioner of
## Indian Affairs T. J. Morgan
## September 5, 1890

### (Excerpt from *Report for 1890*, pp. iii ff.)

*By 1890 the United States Government was confident that it had its Indian policy on a correct course. As the commissioner's annual report phrased it: "It has become the settled policy of the Government to break up reservations, destroy tribal relations, settle Indians upon their own homesteads, incorporate them into the national life, and deal with them not as nations or tribes or bands, but as individual citizens. The American Indian is to become the Indian American." The commissioner's report outlined in exquisite detail the process by which that "Settled Policy" was to be carried out, and even designated that the day on which the Dawes Severalty Act was signed into law, February 8, 1887, was to be a day for celebration and commemoration in the Indian schools. The optimism and good will evident in the anticipation of benevolent change are too obvious to deny. Yet, in a sense, this benevolent change provided an unconscious veneer to the stronger motives which underlay this shift in American Indian policy. Those motives can perhaps best be put in terms of white land hunger and white cultural imperialism.*

THE LAW PRESCRIBES that the Commissioner "shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs, and of all matters arising out of Indian relations." He is charged with the annual disbursement of more than $7,000,000 and with the purchase and distribution of great quantities of subsistence, clothing, agricultural, medical, and other supplies. He gives instructions to more than sixty agents, supervises their work, examines their accounts, decides perplexing questions arising constantly in the course of administration of agency affairs, and through them oversees in detail the various lines of civilization inaugurated among the tribes, farming, stock-raising, building of houses, Indian police and courts, social and sanitary regulations, etc. He determines upon the appointment and removal of over twenty-five hundred agency and school employes, and appoints traders and physicians. Licensed trade among Indians is under his exclusive control.

He considers and determines all questions of law arising in reference to Indian lands; the legal status of Indians with reference to each other and to white people; the conflicts between local or State laws and tribal customs, and between State and Federal laws; also questions of citizenship, guardianship, crimes, misdemeanors; the prosecution of persons for the sale of

9

Law Library

whisky to Indians; taxation; water rights; right of way of railroads; cattle grazing; conveyances of land; contracts between Indians and whites; sales of timber on Indian reservations; allotment of land, etc. Many of these questions, especially those relating to lands, are of great intricacy, involving interpretations of treaties and laws as far back as colonial times.

He is charged with the duty of organizing a plan of education, with all which that implies: the erecting of school houses, appointing of teachers, and the keeping of a watchful oversight over all Indian school matters.

Bills in Congress relating to Indian affairs are usually referred to the Indian Bureau for information and report, and before an act is signed by the President it is generally referred to the Commissioner for report as to whether there is any reason why it should not receive Executive approval. Original bills and reports are also prepared by the Indian Office for transmission to Congress.

Under the act of March 3, 1885, the Commissioner examines and reports to the Secretary of the Interior on all depredation claims, amounting to many millions of dollars, which have been filed in the Bureau during the last forty years.

The foregoing gives an approximate idea of the responsible duties and the varied character of the work performed under his direction and supervision. The duties and labors of the office are constantly increasing and becoming more arduous and difficult as the progress of Indian civilization makes it necessary to deal with the race, not in their collective capacity as tribes and bands, but with the individuals who are being led to the holding of separate estates, thus multiplying many fold the interests to be considered, developed, and protected.

## DIFFICULTIES OF THE SITUATION

I have cited these duties somewhat in detail, because I desire to set forth some of the difficulties which seriously embarrass and limit their satisfactory discharge. The chief one is the lack of sufficient and proper help in the Bureau itself. The nature of the work requires clerical help of a high order. In addition to the force now employed there is needed a chief clerk, who shall be charged with a general oversight of all the correspondence, and who shall follow up important matters from their beginning until the final result is reached.

There should be a solicitor to whom difficult law questions can be referred, and whose special business it shall be to examine and report upon all claims for money presented by Indians. Such an officer might save to the Government thousands of dollars, and at the same time assist the Indians to obtain their just dues. This would obviate the apparent necessity of so many paid attorneys, employed by the Indians at large fees, to prosecute their claims before the office and before Congress.

There is urgently needed at once the following additional clerical help: One clerk of class 4, two of class 3, and three of class 2; also one medical

cattle
...les of
these
...lving

th all
...chers,

to the
...ed by
as to
...roval
...e for

...eports
...ng to
...g the

...s and
...pervi-
...g and
...zation
...ty as
...lding
...onsid-

forth
...ctory
...n the
...order.
..., who
...e, and
...e final

...an be
...upon
to the
...ians to
...many
...their

...help:
...edical

expert, charged with an oversight of the sanitary condition of the Indians. Without sufficient help in the office it is simply impossible to have the work done as it should be. Those now employed are faithful, industrious, and generally competent, but the work is too much for them and must and does suffer. The Commissioner is painfully aware of this fact, but is powerless to help it.

The Indians, with whose welfare and civilization he is charged, are widely scattered, and the territory in what is known as Indian reservations embraces not less than 181,000 square miles. The Navajo Reservation is in extent almost an empire in itself—12,800 square miles. The means of communication between the Bureau and the agents are at best imperfect, and in some instances very unsatisfactory. It is impossible for the Commissioner to visit and inspect all the agencies, he can not always rely upon official reports, and it is often very difficult even for the agents to have a personal knowledge of the territory and the people over whom they are placed.

A great obstacle is found in the strange languages still used by most tribes. They communicate with their agents and with the Bureau through interpreters, who, in some instances, are entirely incompetent for an intelligent transaction of business. Further, the various tribes differ so essentially among themselves in languages, habits, and customs, as well as in environment, as to make it very hard to adapt to their varying necessities any policy which may be adopted.

The entire system of dealing with them is vicious, involving, as it does, the installing of agents, with semi-despotic power over ignorant, superstitious, and helpless subjects; the keeping of thousands of them on reservations practically as prisoners, isolated from civilized life and dominated by fear and force; the issue of rations and annuities, which inevitably tends to breed pauperism; the disbursement of millions of dollars worth of supplies by contract, which invites fraud; the maintenance of a system of licensed trade, which stimulates cupidity and extortion, etc.

The small salaries paid to agents and physicians renders it very difficult to procure the services of thoroughly efficient and honest men who are contented to devote their entire energies to the good of the service without hope of other reward than their meager salaries.

The still all too prevalent public sentiment which looks upon Indians with contempt and regards them as the legitimate spoil of white men, has its influence in lowering the grade of this branch of the public service.

The white people who hang on the borders of the reservations, those who have allied themselves by marriage with the tribes, and even those who from time to time been in Government employ, have, in many cases certainly, presented to the Indians a type of character and a practical philosophy of life on a par with, if not inferior, to their own.

The natural conservatism of the Indians, which leads them to cling with tenacity to their superstitious and inherited practices, adds to the difficulty of inducing them to abandon their own and accept the white man's ways.

11

## A HOPEFUL OUTLOOK

Notwithstanding all these hindrances, however, there has been for ten or more years real progress in the right direction, and the outlook for the future is encouraging. The following points are especially worthy of consideration, and need to be repeated and emphasized until they are fully recognized by both white and Indians:

It has become the settled policy of the Government to break up reservations, destroy tribal relations, settle Indians upon their own homesteads, incorporate them into the national life, and deal with them not as nations or tribes or bands, but as individual citizens. The American Indian is to become the Indian American. How far this process has advanced during the past year will be shown under the head of the reduction of reservations and allotment of lands.

A public-school system is being rapidly provided, whereby every accessible Indian boy and girl of school age is to be afforded an opportunity of acquiring the rudiments of an English education and the elements of an honorable calling. What progress has been made in this direction during the last year is discussed under the general topic of education.

The Indians themselves are coming to understand the present policy of the Government and are showing an increasing readiness and even desire to adjust themselves to it. During the past year I have had personal interviews with prominent chiefs and representative Indians from Wisconsin, North and South Dakota, Oregon, Arizona, New Mexico, Oklahoma, and Indian Territory, and I have been much gratified with their intelligent apprehension of the situation and with the willingness exhibited, as a general thing, to accept lands in severalty with individual citizenship. Almost without exception they have pleaded with me for more and better schools.

Another fact of significance is the growing recognition on the part of Western people that the Indians of their respective States and Territories are to remain permanently and become absorbed into the population as citizens. While demanding the application of the principle of "home rule" in the selection of agents and other employés from the State or Territory in which the Indians are located, I think they also recognize the obligations which they thereby assume to recommend only suitable persons for appointment. If the Indians of South Dakota, for instance, are to remain forever within the limits of the State, either as a burden and a menace, or as an intelligent, self-supporting, co-operative factor in State life, no others except the Indians themselves can have so deep an interest in their practical status as the people by whom they are surrounded.

There is also a growing popular recognition of the fact that it is the duty of the Government, and of the several States where they are located, to make ample provision for the secular and industrial education of the rising generation, leaving the churches free to prosecute with renewed vigor their legitimate work of establishing and maintaining religious missions. By this harmonious and yet separate activity of the Government and the churches

all of the Indians will eventually be brought into right relations with their white neighbors, and be prepared for the privileges and responsibilities of American Christian citizenship.

## SUMMARY OF IMPROVEMENTS ATTEMPTED

In addition to the ordinary routine work of the office, the points to which I have given special attention during the year have been the following:

*The improvement of the personnel of the service.*—Wherever it could be done without too great hardship I have endeavored to remove those who were immoral, incompetent, inefficient, or unfaithful. No one has been discharged on account of politics or religion, and in no single instance except for the improvement of the service. I have steadily refused to remove those who were performing their duties satisfactorily. In making appointments I have, so far as it lay in my power, endeavored to secure persons of good moral character, having special fitness for their work, and where mistakes have been made, I have not been slow to correct them. Allow me, in this connection, to recognize heartily the cordial support given to me in this matter by yourself and the President, and also the painstaking efforts you have both put forth in the selection of Presidential appointees.

*The elevation of the schools.*—A great deal of thought has been given to this subject, and the schools have been visited and inspected with a care and thoroughness hitherto unattempted. The work accomplished by superintendent Dorchester will appear in his report on page 246. Large and careful expenditures have been made in repairing and enlarging school-houses and providing them with proper equipments, and new ones have been erected where most urgently demanded. A new and carefully revised system of rules, including a course of study, has been drawn up and a series of text-books determined upon. A work of this kind is beset with many difficulties and necessarily proceeds slowly, but when once accomplished is enduring.

*The development of industries.*—Great improvements have been made at the Government schools in this important direction. Competent instruction is given to boys in blacksmithing, broom-making, carpentering, dairying, farming, fruit culture, harness-making, printing, tailoring, tinsmithing, shoe-making, stock-raising, wagon-making, and wheel-wrighting; to girls, in all the ordinary duties of housekeeping. The work accomplished among the older Indians in teaching them the arts of agriculture are discussed under the head of Indian farming.

*The improvement of the sanitary service.*—There is a widely prevalent, but very mistaken, notion that the Indians, children of nature, are a healthy, rugged people. Nothing can be further from the truth. They are the sport of disease, are well-nigh helpless in their struggles against the elements, are almost wholly ignorant of the laws of health, are careless of their persons, are dominated by senseless superstitions, are the victims of the crudest kinds of quackery, and perish by hundreds during the prevalence of an epidemic.

13

*The modification of the ration system.*—Heretofore Indians receiving rations have been required to go to the agencies to get them, thus involving a great waste of time and strength. The plan of issuing rations at substations, which is now being put into operation, is discussed more at length under the head of Indian farming.

The common method of issuing live beeves to the Indians is a relic of barbarism, cruel and filthy. Stringent orders have been issued for the correction of this great evil and proper facilities for slaughtering are now being provided.

*Inculcation of patriotism.*—On all Government schools the American flag has been displayed, national holidays have been duly celebrated, the pupils are learning patriotic songs and recitations, and are taught to love the great nation of which they are a part, and to feel that the people of the United States are their friends and not their enemies.

*Discouraging the Wild West Show business.*—I have refused to grant any more licenses for Indians to leave the reservations or to enter into any other contracts with showmen. I have instituted proceedings against showmen and their bondsmen to compel the fulfillment of former contracts, which required them to treat their employés with humanity and justice.

### EDUCATION

In my supplemental report of last year I set forth quite in detail my views regarding Indian education. These views have met with most gratifying acceptance, and have awakened a great deal of interest among all classes of citizens. The plan there outlined has received the indorsement of Dr. W. T. Harris, United States Commissioner of Education, and of General John Eaton, ex-Commissioner of Education, and has been heartily approved by the National Educational Association, the American Institute of Instruction, the New York State Teachers' Association, and other leading educational bodies, besides receiving the warm commendation of distinguished educators and philanthrophic organizations, like the Mohonk Conference, the Indian Rights Association, etc. After a year's practical work in carrying out the ideas there expressed, I see no reason to modify them in any essential particular.

#### TRAINING SCHOOLS

Under the fostering care of the Government a series of training schools has grown up off reservations where, in addition to the ordinary English education, Indian pupils are trained to habits of industry.

*List of training schools with their location, date of opening, and capacity.*

| Name | Location | Date of opening | Capacity |
|---|---|---|---|
| Carlisle | Pennsylvania | 1879 | 500 |
| Salem | Oregon | 1880 | 255 |
| Genoa | Nebraska | 1884 | 250 |

| Name | Location | Date of opening | Capacity |
|------|----------|-----------------|----------|
| Haskell Institute | Lawrence, Kans. | 1884 | 450 |
| Chilocco | Oklahoma | 1884 | 200 |
| Grand Junction | Colorado | 1886 | 60 |
| Albuquerque | New Mexico | 1886 | 225 |
| Carson | Nevada | 1890 | 150 |
| Santa Fé | New Mexico | 1890 | 125 |
| Pierre | South Dakota | 1890 | 90 |
| Fort Totten | North Dakota | 1890 | 250 |

*Showing attendance, cost, etc., of training schools during fiscal year ended June 30, 1890.*

| Name of school | Location | Rate per annum | Capacity | Number of employés | Enrollment | Average attendance | Cost to Government |
|----------------|----------|----------------|----------|--------------------|------------|--------------------|--------------------|
| Albuquerque Training | Albuquerque, N. Mex. | $175.00 | 225 | 28 | 222 | 164 | 27,224.36 |
| Carlisle Training | Carlisle, Pa. | 167.00 | 500 | 54 | 789 | 702 | 100,074.34 |
| Chemawa Training | Near Salem, Oregon | 175.00 | 250 | 33 | 194 | 159 | 30,058.22 |
| Chilocco Training | Chilocco, Oklahoma | 175.00 | 200 | 27 | 196 | 154 | 27,293.21 |
| Genoa Training | Genoa, Nebr. | 175.00 | 250 | 23 | 203 | 176 | 31,851.56 |
| Grand Junction Training | Grand Junction, Colo. | 175.00 | 60 | 9 | 48 | 38 | 9,428.12 |
| Haskell Institute | Lawrence, Kans. | 175.00 | 450 | 54 | 480 | 417 | 75,961.62 |
| Total | | | 1,935 | 238 | 2,112 | 1,818 | 301,691.59 |

For the fiscal year ending June 30, 1891, Congress has made liberal appropriations for these schools which will help the Office to put them on a broad basis, and thoroughly equip them for their important work. With the improvements now being made they will be able next year to care for not less than thirty-three hundred students.

In estimating the work done several things should be carefully borne in mind: These institutions are not universities, nor colleges, nor academies nor high schools. In the best of them the work done is not above that of an ordinary grammar school, while in most it is of the primary or intermediate grade.

The pupils come to them for the most part ignorant of the English language, unaccustomed to study, impatient of restraint, and bringing with them many of the vices and degraded habits of camp life. From the very necessities of the case, the length of time which most of them have been kept in school has been very short. The time required for children in the public schools to complete a course of study embraced in the primary, intermediate, grammar, and high school is from fourteen to fifteen years. It has been heretofore commonly supposed that three years was long enough to educate an Indian and fit him to compete with his white neighbor, who has enjoyed so much greater advantages.

The work, embracing as it necessarily does, the supplanting of a foreign language by the English, the destruction of barbarous habits by the substitution of civilized manners, the displacement of heathenish superstitions by the inculcation of moral principles, the awakening of sluggish minds to intellectual activity by wise mental training and the impartation of useful knowledge, has been undertaken by these Indian teachers almost single-handed and alone, unaided by those potent factors outside of school which play so large a part in the education of our own children.

It is a fact not to be forgotten in any discussion of popular education that the most important factors in the development of our American civilization have been in the colleges, universities, and professional schools. Without these there would have been no common schools. If the average of intelligence among the Indians is to be brought up to the level of that of the other peoples which compose our nation, and they are to be prepared to compete in life's struggles on an equal basis, provision must be made whereby those among them who are specially-gifted with talent, ambition, and energy may procure a higher education than is offered to them in the reservation and training schools. Already a very considerable number have shown both the desire and ability to pursue higher studies. Several are now successfully teaching, or fitting themselves to teach, others are practicing medicine, some are preaching, and still others are preparing for the practice of law. The desire for these higher studies is steadily increasing and only needs a little fostering to be productive of the best results. A common school, industrial education for all, a liberal and professional education for the worthy few, with a fair field and free competition, is all that is asked for Indians as for others.

The outing system which brings Indian youth into intimate and vital relationship with civilized communities is now steadily developing and is productive of the most hopeful results. During the past year Carlisle has accommodated nearly eight hundred pupils, more than half of whom have had the inestimable advantage of living and working, for periods varying from a few weeks to several months, with Pennsylvania farmers and others, who have paid them a reasonable compensation. Their work has been very satisfactory, and the school has been unable to meet the demand made upon it for help. When the present plans for increasing its capacity are completed, not less than a thousand pupils can be cared for at this one institution, and so far as I can now see it will be entirely feasible to carry perhaps double this number. Every Indian boy or girl who secures a place to work at fair wages has become a producer, and is practically independent and self-supporting.

The superintendent of Haskell Institute writes me that he expects to be able, when the present plans for that school are completed, to care for one thousand students, and to provide homes for a large number of them among Kansas farmers. How far it will be possible to extend the outing system in connection with these training schools I am not prepared to say, but the system seems to have great possibilities, and its development shall receive my constant and careful attention.

These training schools, removed from reservations, offer to the pupils opportunities which can not by any possibility be afforded them in the reservation schools. The atmosphere about them is uplifting, they are surrounded by the object lessons of civilization: they are entirely removed from the dreadful down-pull of the camp. If the entire rising generation could be taken at once and placed in such institutions, kept there long

Law Library

16

enough to be well educated and then, if such as choose to do so were encouraged to seek homes among civilized people, there would be no Indian problem.

## RETURNED STUDENTS

It should be especially remembered that the oldest of these training schools, that at Carlisle, Pa., has been in existence only eleven years, and last year graduated its first class. Very few of the graduates have returned to their homes and none of them as yet had any opportunity to show what they can do. The unfairness of some of the criticisms upon returned students, who are inaccurately denominated "Carlisle graduates," or "graduates of the Carlisle University," is apparent. There has been no time in which to estimate from practical experience the influence which has been exerted upon these pupils. The time has not been too short, however, to show that, notwithstanding all the hindrances under which the work is carried forward, Indian children, under equally favorably conditions, are just as susceptible of education as any other class.

Relatively to the Indian population, a very small proportion of boys and girls have yet been brought under the influence of these schools. The few who have returned home have therefore found themselves in too many cases isolated by their dress and habits, out of sympathy with their surroundings, ostracized by their companions, and too frequently practically helpless. The remedy for this is two-fold. First, the universal education of the rising generation, so that there will be a common bond of sympathy and mutual helpfulness between them. Second, the encouragement of pupils who have finished the course of study in the training schools to seek for themselves homes and employment among civilized people.

Pupils in these schools should be taught that they must depend upon themselves and not expect to be furnished employment by the Government. Ample opportunities are afforded them for acquiring an education, with the expectation that they will prepare themselves to earn their own living. There is no necessity of their returning to the reservations, except as a matter of choice, for all who are intelligent, industrious, honest, and thoroughly capable can secure honorable and remunerative employment among civilized people, which they should be encouraged to seek.

## RESERVATION SCHOOLS

*Boarding schools.*—The following is a list of the sixty-three Government boarding schools on reservations:

Arizona—Colorado River, Fort Mojave, Navajo, Keams Cañon, Pima, San Carlos; California—Fort Yuma; Idaho—Fort Hall, Fort Lapwai, Lemhi; Indian Territory—Quapaw, Seneca; Kansas—Kickapoo, Pottawatomie, Sac and Fox and Iowa; Minnesota—Leech Lake, Red Lake, White Earth; Montana—Blackfeet, Crow, Fort Peck; Nebraska—Omaha, Santee, Winnebago; Nevada—Pyramid Lake, Western Shoshone; New Mexico—Mescalero;

North Dakota—Fort Stevenson, Standing Rock(2); Oklahoma—Absentee Shawnee, Arapaho, Cheyenne, Kaw, Kiowa, Osage, Otoe, Pawnee, Ponca, Sac and Fox, Wichita; Oregon—Grande Ronde, Klamath, Siletz, Sinemasho, Umatilla, Warm Springs, Yainax; South Dakota—Cheyenne River, Crow Creek, Lower Brulé, Pine Ridge, Sisseton, Yankton; Utah—Uintah; Washington—Chehalis, Neah Bay, Puyailup, Quinaielt, S'Kokomish, Yakima; Wisconsin—Green Bay; Wyoming—Shoshone.

Concerning these schools it may be said: They have been for the most part poorly equipped. The buildings in many cases were small, cheap, inconvenient, often inadequately furnished, frequently very deficient in ventilation, heating, and water supply. Many had been grossly neglected and were sadly out of repair. During the past year, an earnest effort has been made to improve them by repairs, additions, or new buildings, and by supplying water or heating facilities, as needed. There still remains much to be done, however.

If the work is to be made at all adequate to the necessities of the case, there should be a very considerable increase in the number of these schools, and at an early day new schools should be established at the following places:

Arizona—Fort Apache on San Carlos Reservation; Papago Reservation, Navajo Reservation, and among the Moquis; California—Hoopa Valley Agency, Mission Agency, Round Valley Agency; Colorado—Southern Ute and Jicarilla Agency; Montana—Blackfeet Agency, Tongue River Agency; New Mexico—Zuni Reservation; Oklahoma—Cantonment, Jesse Bent's ranch, and Seger Colony on Cheyenne and Arapaho Reservation; South Dakota—Pine Ridge Reservation, Rosebud Reservation; Utah—Ouray Agency; Wisconsin—Oneida Reservation, and four of the reserves of the La Pointe Agency.

The limit heretofore placed by law upon the cost of the buildings—$10,000—has been so low that it has been impossible to provide proper accommodations. To establish a boarding-school involves making provision not only for school rooms proper, but for dormitories, kitchen, laundry, bath-rooms, hospital, and other necessary rooms for pupils, and also of suitable quarters for all the employés, superintendent, teachers, matron, cook, laundress, seamstress, etc. The original cost of the plant is a comparatively small part of the outlay. It is a poor economy to put up inferior buildings and fail to make proper provision for the work expected, which can not be satisfactorily done with such poor facilities. The limit of cost now fixed is $12,000, which is still too low.

These schools are surrounded by influences which necessarily hamper them very seriously in their work. They are far removed from civilization, feel none of the stimulating effects of an intelligent public sentiment, and have little helpful supervision. The parents have ready access to them, and often prove troublesome guests by reason of their clamors for the return of the children to their tepees. It is exceedingly difficult to break up the use of the tribal tongue and to teach them to use the English language. Notwith-

Absentee
, Ponca,
:emasho,
:r, Crow
:; Wash-
Yakima;

:he most
, cheap,
cient in
:eglected
ffort has
, and by
much to

:he case,
schools,
:llowing

:rvation,
: Valley
:rn Ute
Agency;
: Bent's
:; South
—Ouray
f the La

:ldings—
: proper
:rovision
:aundry,
: also of
:matron,
:ompara-
:inferior
:l, which
:t of cost

:hamper
:lization,
:ent, and
:em, and
:eturn of
:e use of
:Notwith-

standing these difficulties, however, they are doing a good work, directly upon their pupils and indirectly upon the older people of the reservations, and there goes out from them a civilizing force whose strength and value can scarcely be overestimated.

To render them still more efficient they should be increased in number, be better equipped, more closely supervised, and subjected to more rigid discipline. The teachers should be selected with care, have a reasonably secure tenure of office, and have pay equal to that received for a similar grade of work in the public schools of the same State or Territory. These schools should be feeders for the training schools, and deserving, capable pupils should be regularly and systematically promoted.

*Day schools.*—During the past year there were in operation at the various agencies 106 day schools with an enrollment of 3,967, and an average attendance of 2,367.

Of these schools I wish to say that I found them in existence when I assumed the duties of the office; 11 new ones have been established, and 8 of the old ones have been abandoned. Of the whole number 81 are conducted by the Government and 25 are carried on under contract.

The teachers labor under very great disadvantages. The houses are poor and the furniture scanty. The accommodations for the teachers are very primitive; the isolation and deprivations are hard to bear; the influences of the camps are often wholly antagonistic to those of the schools; it is extremely difficult to break up the use of the tribal language; many of the children are poorly fed, scantily clad, untidy in their habits, and irregular in their attendance.

On the other hand, it must be said that a good day-school well administered is an object lesson of civilization in the midst of barbarism, for the children carry home daily some influence which tends toward a better life. It permits the parents the presence of their children, to which many of them attach great importance, and to whose prolonged absence they could not be induced to consent, and there is gradually being produced, no doubt partly at least through these schools, a public sentiment among the camp Indians more friendly to education and progress in civilization.

I believe it is possible to raise the character of these schools by providing better houses and facilities for work, by introducing some form of elementary industry, and by paying more attention to supervision. The effort to do this is now being made, which, if it is successful, may lead to the establishment of others on a better basis.

## INDIANS IN THE PUBLIC SCHOOLS

Believing that the true purpose of the Government in its dealings with the Indians is to develop them into self-supporting, self-reliant, intelligent, and patriotic citizens, and believing that the public schools are the most effective means of Americanizing our foreign population, I am desirous of bringing the Indian school system into relation with that of the public schools. Not only so, but wherever possible I am placing Indian pupils in

Case 1:03-cv-00768-DCS Document 27 Filed 10/12/...

McCay Law Library

the public schools. Very few are thus far enjoying these advantages, but in a letter addressed to the superintendents of public instruction in the several States and Territories where there are Indians under the care of the National Government I have invited their co-operation, and have offered to contract with school districts for the tuition of Indian pupils at the rate of $10 per quarter.

I think this will prove a very important feature of the work in hand, and confidently expect within a year to be able to report a great advance in this direction. Indian allottees can be provided with educational facilities for their children in no more satisfactory manner, and the tuition paid by the Government aids the school districts to maintain schools in sections of the country where lands in severalty have been taken by the Indians.

### COMPULSORY EDUCATION

My predecessors and many of the agents and superintendents of schools have strongly urged the importance and necessity of a law compelling the attendance of pupils at the schools. I am in favor of compelling every Indian child of suitable age and health, for whom accommodations are provided, to attend school ten months out of twelve. A general law, however, could not now be everywhere applied, for the simple reason that school accommodations are provided by the Government for less than half the children of school age. The question among many tribes is not so much one of filling the schools as it is of finding room for the pupils. With few exceptions every reservation school is crowded, and hundreds of children who are willing to go to school are prevented by want of proper accommodations.

Something in the way of compulsory attendance may be secured through the authority already vested in the agent under direction from this Office, whereby full and regular attendance at school is required upon forfeiture of rations, annuities, or other favors as the penalty for indifference or open opposition. It does not meet the case of the non-reservation schools, however. Under the law children can not be taken from the reservation except by permission of their parents, and although the non-reservation schools are generally better equipped than those at the agencies, at times great difficulty is experienced in inducing pupils and parents to consent to the transfer.

### SCHOOL ATTENDANCE

*Showing enrollment and average attendance at Indian schools for the fiscal years 1887, 1888, 1889, and 1890.*

| Kind of school | Enrolled | | | | Average attendance | | | |
|---|---|---|---|---|---|---|---|---|
| | 1887 | 1888 | 1889 | 1890 | 1887 | 1888 | 1889 | 1890 |
| Government schools: | | | | | | | | |
| Training and | | | | | | | | |
| boarding....... | 6,847 | 6,998 | 6,797 | 7,236 | 5,276 | 5,533 | 5,212 | 5,644 |

| | Enrolled | | | | Average attendance | | | |
|---|---|---|---|---|---|---|---|---|
| Day............. | 3,115 | 3,175 | 2,863 | 2,963 | 1,896 | 1,929 | 1,744 | 1,780 |
| Total......... | 9,962 | 10,173 | 9,660 | 10,199 | 7,172 | 7,462 | 6,956 | 7,424 |
| Contract schools: | | | | | | | | |
| Boarding........ | 2,763 | 3,234 | 4,038 | 4,186 | 2,258 | 2,694 | 3,213 | 3,384 |
| Day............. | 1,044 | 1,293 | 1,307 | 1,004 | 604 | 786 | 662 | 587 |
| Industrial boarding, specially appropriated for........ | 564 | 512 | 779 | 988 | 486 | 478 | 721 | 837 |
| Total......... | 4,371 | 5,039 | 6,124 | 6,178 | 3,348 | 3,958 | 4,596 | 4,808 |
| Aggregate...... | 14,333 | 15,212 | 15,784 | 16,377 | 10,520 | 11,420 | 11,552 | 12,232* |

*The average attendance for 1890 is computed on the attendance during the entire year including summer vacations. The average attendance for the nine months from October 1 to June 30, was 12,462, a gain of 1,021 over the corresponding months of the preceding year.

The total enrollment during the year ended June 30, 1890, is 16,377, while the estimated school population (six to sixteen years of age), exclusive of the Indians of New York State and the Five Civilized Tribes, is 36,000.

Many reasons have combined to cause this comparatively small attendance, of which a few may be mentioned. Very inadequate provision has been made. In some cases, as among the Navajos for instance, where there is a school population of 3,600, with accommodations for only 150 pupils, or at San Carlos Agency, where the conditions are similar, I have no doubt that the attendance could be doubled in one year, simply by making provision for the children who can not go to school because there is no school for them to go to. In many places the Indians are impatient in their demands for the schools which the Government has failed to supply them, though in some cases they have been promised for years.

In many instances the facilities have not only been inadequate, but the school-houses have been unattractive and unhealthy and the children have been neglected or badly treated. Great improvements have been made during the year, and others are under way which will insure for next year a considerable increase in attendance.

In some cases the agents have taken little or no interest in the schools, or have been so occupied with other cares that they have done little or nothing to build them up or make them inviting, while in still others the small attendance is directly chargeable to their ignorance, neglect, or even secret opposition. Where this has seemed to be beyond improvement or remedy, I have not hesitated to suggest it to you as a sufficient cause for removal.

One great hindrance is the poor health so common among the Indian children. Disease is very prevalent, and during the last year the ravages of the grippe were very distressing. There were thousands of cases of it, and where it was not necessary actually to suspend the schools the number of

pupils in attendance was very largely decreased. The Indians as a whole suffer especially with pulmonary troubles, sore eyes, and diseases of the skin, and it must be conceded that these conditions offer one of the most serious obstacles to a regular, uniform school attendance.

Another hindrance is, very naturally, the failure of parents and children alike to appreciate the nature and importance of education. They can not see for themselves, and it is difficult to make them understand all it means for them. They either ignore the school entirely or expect it to accomplish wonders in a brief period. Three years they consider a very long time in which a boy or girl should not only fully master the English language, but acquire all the accumulated learning of the white man. Happily, a great change in this respect is taking place, and there is a growing desire among parents as well as among children that the education may be more complete.

If the Government will provide the means to establish and maintain schools in accordance with the system laid down in my supplemental report of last year, it is only a question of time—two or three years I think will suffice—when all Indian youth of school age and of suitable health can be put into school.

The following tables, taken from that report and brought down to date, show the number of Indian pupils who have been attending school since 1882 and the appropriations which have been made for Indian education since 1877.

*Showing Indian school attendance from 1882 to 1890, both inclusive.*

| | Boarding schools | | Day schools | | Totals | |
|---|---|---|---|---|---|---|
| Year | Number | Average attendance | Number | Average attendance | Number | Average attendance |
| 1882..... | 71 | 2,755 | 54 | 1,311 | 125 | 4,066 |
| 1883..... | 75 | 2,599 | 64 | 1,443 | 139 | 4,042 |
| 1884..... | 86 | 4,358 | 76 | 1,757 | 162 | 6,115 |
| 1885..... | 114 | 6,201 | 86 | 1,942 | 200 | 8,143 |
| 1886..... | 115 | 7,260 | 99 | 2,370 | 214 | 9,630 |
| 1887..... | 117 | 8,020 | 110 | 2,500 | 227 | 10,520 |
| 1888..... | 126 | 8,705 | 107 | 2,715 | 233 | 11,420 |
| 1889..... | 136 | 9,146 | 103 | 2,406 | 239 | 11,552 |
| 1890..... | 140 | 9,865 | 106 | 2,367 | 246 | 12,232 |

*Annual appropriations made by the Government since the fiscal year 1877 for support of Indian schools.*

| Year | Appropriation | Per cent of increase | Year | Appropriation | Per cent of increase |
|---|---|---|---|---|---|
| 1877........ | $20,000 | ........... | 1885....... | $992,800 | 47 |
| 1878........ | 30,000 | 50 | 1886....... | 1,100,065 | 10 |

Left-margin fragments (cut off at page edge):

a whole
he skin,
serious

children
can not
means
omplish
time in
age, but
a great
among
re com-

aintain
report
nk will
can be

to date,
oi since
ucation

| Year | Appropriation | Per cent of increase | Year | Appropriation | Per cent of increase |
|------|---------------|----------------------|------|---------------|----------------------|
| 1879 | 60,000 | 100 | 1887 | 1,211,415 | 10 |
| 1880 | 75,000 | 25 | 1888 | 1,179,916 | 02.6 |
| 1881 | 75,000 | .... | 1889 | 1,348,015 | 14 |
| 1882 | 135,000 | 80 | 1890 | 1,364,568 | 01 |
| 1883 | 487,200 | 260 | 1891 | 1,842,770 | 35 |
| 1884 | 675,200 | 38 | | | |

In this connection it is worth while to note the allowances made by the Government to other than Government schools for the education of Indians.

*Showing amounts set apart for various religious bodies for Indian education for each of the fiscal years 1886 to 1891, inclusive.*

| | 1886 | 1887 | 1888 | 1889 | 1890 | 1891 |
|---|------|------|------|------|------|------|
| Roman Catholic | $118,343 | $194,635 | $221,169 | $347,672 | $356,957 | $363,349 |
| Presbyterian | 32,995 | 37,910 | 36,500 | 41,825 | 47,650 | 44,850 |
| Congregational | 16,121 | 26,696 | 26,080 | 29,310 | 28,459 | 27,271 |
| Martinsburgh, Pa. | 5,400 | 10,410 | 7,500 | Dropped | ...... | ...... |
| Alaska Training School | | 4,175 | 4,175 | ...... | ...... | ...... |
| Episcopal | | 1,890 | 3,090 | 18,700 | 24,876 | 29,910 |
| Friends | 1,960 | 27,845 | 14,460 | 23,383 | 23,383 | 24,743 |
| Mennonite | | 3,340 | 2,500 | 5,125 | 4,375 | 4,375 |
| Middletown, Cal. | | 1,523 | Dropped | ...... | ...... | ...... |
| Unitarian | | 1,350 | 5,400 | 5,400 | 5,400 | 5,400 |
| Lutheran | | | 1,350 | 4,050 | 7,560 | 9,180 |
| Methodist | | | | 2,725 | 9,940 | 6,700 |
| Miss Howard | | | | 275 | 600 | 1,000 |
| Appropriation for Lincoln Institution | 33,400 | 33,400 | 33,400 | 33,400 | 33,400 | 33,400 |
| Appropriation for Hampton Institute | 20,040 | 20,040 | 20,040 | 21,040 | 20,040 | 20,040 |
| Total | 228,259 | 363,214 | 376,264 | 530,905 | 562,640 | 570,218 |

verage
endance

4,066
4,042
6,115
8,143
9,630
10,529
11,420
11,552
12,232

ort

Per cent of increase

47
10

* * *

## HOLIDAYS

As a part of their education and a means of preparation and training for civilized home life and American citizenship, it is important that the pupils in these schools should understand the significance of national holidays and be permitted to enjoy them. To this end general instructions have been issued for the appropriate celebration of New Year's Day, Franchise Day (February 8), Washington's birthday, Decoration Day, Fourth of July, Thanksgiving, and Christmas, as well as Arbor Day.

The reports received in reply to these circulars are of unusual interest, showing that both teachers and pupils entered heartily into the spirit of the various occasions. Very creditable programmes of exercises for these different days are on file in the office, in some of which adult Indians took active part, giving good advice to the children, and for the time being, at least, identifying themselves with the new ideas brought forward.

On a few of the reservations Memorial Day could be as fittingly observed as elsewhere, by the decoration of the graves of Indians who enlisted in the United States Army and lost their lives during the war.

Tree planting on Arbor Day was quite extensively engaged in by the schools, and the interest excited led some of the Indians to plant trees around their own houses. The yearly observance of this day can not fail to add greatly to the attractiveness of agency and school premises and to the adornment of Indian homes.

I take pleasure in quoting the interesting account given by Special Agent Alice C. Fletcher of the celebration by the Nez Percés of Idaho of the last Fourth of July:

> The people began to gather a day or two before the Fourth, and to erect their awnings and tents in the pine grove about the church. Over five hundred were present, and the place, otherwise so quiet, resounded with the laughter and chatter of old and young. The day opened with a religious service held at 6 a. m. under a large awning tied to tall trees. At 8 a. m. the children and their parents, all clad in citizens' clothes and decked out in their best, gathered in front of the church, where, on the porch, sat the four elders. Some of the boys carried little flags, and all joined in a song new to me, the words being: "We'll stand, Fourth of July," closing with: "Hurrah! Fourth of July," all the men removing their hats. As I walked about I was greeted with a hand-shake, a nod of the head, and smiles, and "Fourth of July," much as we say "Happy New Year." Soon a procession was formed, the boys leading, and graded as to size; the girls followed, arranged in the same manner down to little tots; then came the men, the women bringing up the rear. The column moved sedately round through the trees, all singing: "We'll stand, Fourth of July," until they returned in front of the church, when all seated themselves, and the native pastor introduced the various speakers—all Indians. These commented on the happiness of an orderly Christian life in contrast to the wild roving life that the people had formerly led, and urged all—both old and young—to be good men and women. One man declared that he did not fully understand what we celebrated, but Fourth of July was to celebrate, just as a returned student was stepping forth to give the historical data of the day the crier announced that the people must begin to prepare for dinner, and the audience melted at the summons.
>
> The beef and salmon were roasted before large fires, and the meal was served under the awning on table cloths and white china. A blessing was asked, and all fell to with zest. It was a comfortable meal of beef, salmon, canned fruit, bread, cake, and wild potatoes. After dinner the business of adopting certain persons into the tribe was attended to, and in the evening some Indians provided a few fire-works, after which all gathered under the stars for an evening service of prayer, and as happy and peaceful a day as I ever saw came to an end.

The establishing of these new, independent communities will of necessity increase for a time the number of farmers required for their instruction. The estimates submitted by the various agents for such additional farmers as are required for the year ending June 30, 1891, amount to over $62,000. The sum appropriated by Congress is $60,000. In view of the progress now being made, in the allotment of lands, and of the importance that the Indians should be prepared for this step by intelligent instruction in the proper use of their land, and considering that every acre put under cultivation yields a substantial return for the labor and money expended, I recommend that for the fiscal year ending June 30, 1892, the sum of $100,000 be appropriated for the pay of additional farmers.

The Indians should be given distinctly to understand that the employment by the Government of white farmers is a temporary expedient, to be abandoned at an early day. They should be taught that they must very soon depend entirely upon themselves, and that their future prosperity will depend largely upon the use they are now willing to make of the opportunities for learning to farm offered to them by the Government.

## IRRIGATION

Large bodies of lands now included in reservations are practically worthless for farming purposes, without irrigation. The spread of the white population over the public domain, the reduction of reservations, the confining of Indians to ever-narrowing borders, makes the problem of their support one of increasing difficulty and urgency. White people are able to combine in the creation of expensive and extensive irrigating plans, which the Indians can not do. From the attention which I have been able to give to the subject, I am led to believe that by the expenditure of moderate sums of money in constructing reservoirs and irrigating ditches, employing Indians to perform most of the labor, and instructing them in the construction, care, and use of these reservoirs and ditches, large numbers of them may be prepared for self-support. It is my purpose during the coming year to pay special attention to this matter, collect suitable data, and lay before you in my next annual report some plan of operation. The matter can not safely be deferred any longer. What has already been done in this direction warrants belief in the advisability of doing much more.

* * *

## RULES FOR INDIAN SCHOOLS

### IN GENERAL

The importance attached to the subject of Indian education is set forth in the following letter addressed by the honorable the Secretary of the Interior to each newly appointed Indian agent:

In connection with your appointment as agent at the ———— agency, I am directed by the President to inform you that the office to which you are appointed is considered one of far more than ordinary importance, both for the interests of the Government and of the Indians who will be brought under your charge and direction; that sobriety and integrity must mark the conduct of every one connected or associated directly or indirectly with the agency under your charge; that an improved condition in the affairs of the agency will be expected within a reasonable time, both as to methods of doing business and as to the condition of the Indians; that the education and proper training of the Indian children and the agricultural and other industrial pursuits of the adult Indians must receive your constant and careful attention, to the end that they may be advanced in the ways of civilization and to the condition of self-support; and that your commission will be held with the express understanding that you will use your utmost endeavors to further these objects and purposes.

The general purpose of the Government is the preparation of Indian youth for assimilation into the national life by such a course of training as will prepare them for the duties and privileges of American citizenship. This involves the training of the hand in useful industries; the development of the mind in independent and self-directing power of thought; the impartation of useful practical knowledge; the culture of the moral nature, and the formation of character. Skill, intelligence, industry, morality, manhood, and womanhood are the ends aimed at.

Government schools for Indians are divided into five general classes: Reservation day schools, reservation boarding schools of first and second grades, and industrial training schools of first and second grades.

It is the duty and design of the Government to remove, by the shortest method, the ignorance, inability, and fears of the Indians, and to place them on an equality with other races in the United States. In organizing this system of schools, the fact is not overlooked that Indian schools, as such, should be preparatory and temporary; that eventually they will become unnecessary, and a full and free entrance be obtained for Indians into the public school system of the country. To this end all officers and employés of the Indian school service should work.

*Superintendent of Indian Schools*

Under the law it is the duty of the Superintendent of Indian Schools—

To visit and inspect the schools in which Indians are taught in whole or in part from appropriations from the United States Treasury, and report to the Commissioner from appropriations from the United States Treasury, and report to the Commissioner of Indian Affairs what, in his judgment, are the defects, if any, in any of them in system, in administration, or in the means for the most effective advancement of the pupils therein toward civilization and self-support, and what changes are needed to remedy such defects as may exist; and to perform such other duties as may be imposed upon him by the Commissioner of Indian Affairs subject to the approval of the Secretary of the Interior.

*Supervisors of Education*

The supervisor of education appointed for a special locality shall visit and inspect the boarding and day schools under his supervision; advise with the teachers, give them instructions in methods of teaching, and report to the Commissioner of Indian Affairs what defects, if any, exist in the schools visited, referring specially to the qualifications and efficiency of each teacher, and the discipline and progress of each school, and shall recommend such measures as in his judgment will improve the condition of the schools and increase the interest of pupils and parents.

## RESERVATION BOARDING SCHOOLS

*Duties of Officers and Employés*

### Agent

1. The agent is the highest authority on the reservation in all matters pertaining to the schools, as well as to other interests of the Indians; but he is not authorized to give directions to school employés regarding their school duties, except through the superintendent.

2. The agent shall have general supervision of all school work among the Indians under his charge. He must visit all schools whether Government, contract, or mission, at least four times each year, keep himself thoroughly informed as to their condition and efficiency, and make quarterly reports concerning the same to the Indian Office.

3. It is the duty of the agent to keep the schools filled with Indian pupils, and, so far as practicable, to place every Indian child of school age in school. He should accomplish this by persuasion, if possible, but, when milder methods fail, he may withhold rations or annuities, or use such other proper means as will produce the desired result.

On reservations where there is more than one school and more than one tribe of Indians there should be in each school pupils from each of the tribes. This will facilitate English speaking by the pupils and tend to overcome the race and tribal prejudices of Indians.

4. It is desirable that an equal number of each sex be kept in school. It is likewise advantageous to the children to enroll them at as early an age as possible; but children under five years of age shall not be enrolled except by permission of the Commissioner of Indian Affairs.

5. The agent is expected to see that the pupils have proper moral, mental, and industrial training; that their physical welfare is properly cared for; that abundant wholesome food, suitable clothing, sufficient fuel, and an ample supply of good water are provided the schools; that sanitary laws and regulations are complied with; that the buildings are properly heated, lighted, and ventilated; that the dormitories are not overcrowded, and that proper medical attendance and supervision are afforded.

6. The agent shall exercise merely an advisory supervision over a bonded school within the limits of his agency jurisdiction, or adjacent thereto. He is

27

required to cooperate with the superintendent in every way practicable for the general well-being of the school. He shall endeavor to keep the school filled with pupils, and when necessary shall assist with his police force in maintaining order, preventing desertions, and returning runaways, and he shall exert his authority whenever necessary to maintain the discipline or efficiency of the school.

### School Superintendent

7. The superintendent shall have immediate general control of the school. He is responsible for the discipline, the classification of pupils, and the distribution of duties among the employés. His orders must be carried into effect, both in letter and in spirit. He shall act as principal teacher, unless a principal teacher is provided for the school, and in the absence of an industrial teacher, shall have immediate charge of the duties usually belonging to that employé.

8. The superintendent shall arrange a regular program of school-room exercises and industrial work, and assign teachers and employés to their duties in accordance therewith, clearly defining the duties of each. He shall also decide upon the hours of recitation and industrial work for each pupil in the school.

9. The superintendent shall, as occasion may require, hold meetings with his associate teachers and employés for consultation as to the general welfare of the school; shall treat his subordinates with respect, support them in the exercise of proper authority, and ordinarily shall issue orders to individual pupils through those only who have the special care of them.

10. When the superintendent finds it advisable to correct faults of teachers or employés or to call attention to inefficient service or neglect of duty on their part, it must be done at some other time and place than in the presence of pupils. No public reprimand of an employé is permitted.

11. In cases of controversy or want of harmony which the superintendent is unable to settle amicably, appeal may be made to the agent, who shall give a hearing, in his office if practicable, to all parties concerned, and if he shall be unable to restore cordial relations among the school employés, he shall report all the facts to the Indian Office, suspending offenders if the interests of the service require it, pending definite instructions from the Commissioner of Indian Affairs.

12. The superintendent must give close personal attention to every department of the school. He is expected to visit all employés while in the performance of their duties as frequently as may be necessary to ascertain not only the character of work done by them, but to advise them wherein they fail in fidelity, efficiency, or discipline. The industrial work among the boys must have his special attention. He should so supervise this branch of the service as to leave no excuse for neglect upon the part of teachers or pupils.

13. Once each week regularly at a stated hour the superintendent is required to make a personal inspection of the dormitories and infirmaries.

observing the personal appearance and clothing of the pupils, and the condition of the rooms and everything therein. At such time each pupil must be in his own proper place in the dormitory or infirmary. This personal, vital contact, weekly, with every pupil in the school should enable the superintendent to give such advice and direction as will promote the physical, mental, and moral well-being of those under his charge. It should be made with conscientious fidelity and thoroughness.

14. The superintendent must reside in the school buildings, and where practicable, in the boys' department.

15. The superintendent cooperating with the physician and matron must see that all cases of infectious and contagious diseases are isolated, and that toilet articles used by pupils having inflamed eyes, skin diseases, or other such disorders, are not used by other pupils.

16. In cases not covered by these rules the superintendent is expected to use his discretion and judgment, and he may adopt for the administration of the minor affairs of the school a special code of rules, not inconsistent with those herein.

17. The superintendent shall forward all official communications to the Indian Office through the agent. He is especially advised that absolute union of purpose and effort is essential to the efficiency of his school, and he should therefore strive to cooperate heartily with the agent, upon whose support and friendship much of his success must depend.

18. The superintendent shall submit to the Indian Office, through the agent, at the close of each school year, an annual report giving a full history for the year of the school and of each of its departments. He may require that written reports be made to him at the close of the year by the principal teacher, matron, industrial teacher, and other employes.

19. The superintendent of a bonded school on or adjacent to an Indian reservation is independent of the agent, so far as school management, the duties defined in his bond, and department regulations are concerned, but, as already stated, the agent is expected to exercise an advisory supervision of the school and to report to the Indian Office his observations. The success of the school must depend largely upon the cordial cooperation with the agent, and harmonious relations between the superintendent and agent should be maintained.

### Clerk

20. The clerk of a bonded school, if there be one, shall perform such clerical duties as may be required, and may be assigned to other duties by the superintendent. In small bonded schools the clerk will act as teacher or industrial teacher, or in such other capacity as the superintendent may direct.

### Physician

21. The school physician shall have oversight of all sanitary matters connected with the school, and in addition to his professional duties shall give the pupils simple, appropriate talks on the elementary principles of physiology and hygiene, explaining the processes of digestion and assimila-

tion of food, the circulation of the blood, the functions of the skin, etc., by which they may understand the necessity for proper habits of eating and drinking, for cleanliness, ventilation, and other hygienic conditions. The correct manner of treating emergency cases, such as hemorrhage, fainting, drowning, prostration from heat, etc., should be explained. Classes composed of the most advanced and intelligent pupils should be formed for instruction by the physician in regard to nursing and care of the sick, administering medicines, preparing food for invalids, and any other points of like character on which it would be proper to give such pupils instruction. In the absence of a school physician, these duties will devolve upon the agency physician so far as practicable. A permanent record must be kept of all cases treated by the physician.

### Teachers

22. The principal teacher, under directions from the superintendent, shall have charge of the school-room exercises. He shall arrange classes, define hours of study and recitation, supervise the literary work, teach classes as the superintendent may direct, and perform the duties of any teacher who may be temporarily absent. School-room exercises should occupy about five hours each day, and each pupil should average not less than three hours' work in the school room daily.

23. The duties of each teacher shall be those assigned by the superintendent and principal teacher. Where there is but one teacher he or she shall be secretary of the school and shall keep the school register. Any teacher may be required by the superintendent to assist the clerical work incident to the school.

### Matron

24. The matron shall have charge of the dormitories, see that the beds are properly cared for, that the toilet of the girls is carefully made each morning, that the clothing of both girls and boys is kept in proper condition, and also shall have general oversight of the kitchen and dining room, and all the domestic affairs of the school. With the coöperation of the superintendent she shall see to it that the principal part of the work in the kitchen, laundry, dining room, and sewing room is performed by the girls of the school, who shall be regularly detailed for that purpose. She is expected to reside in the girls' building.

### Industrial Teacher

25. The industrial teacher, under direction of the superintendent, shall attend to all the outside manual labor connected with the school, cultivating thoroughly the school farm and garden, caring for the stock belonging to the school, keeping a supply of fuel on hand, making repairs on buildings, and seeing that the school property and grounds are kept in good order. All such work must be done, with his assistance and supervision, by the boys of the school regularly detailed for that purpose.

### Cook

26. The cook, with the assistance of the pupils, who must be regularly detailed for that purpose, shall prepare all food required for the school.

including such as may be needed by the sick, attend to the setting of the tables, washing of dishes, and cleaning of the lamps each day; see that everything in the kitchen and dining room is kept in proper order, and that the kitchen and dining room are locked at night, and shall be responsible to the superintendent for all the articles in her department.

### Seamstress

27. The seamstress, with the assistance of the girls, must perform all kinds of sewing required, including mending, and must teach the girls to make and mend both their own clothing and that of the boys.

### Laundress

28. The laundress, with the assistance of the girls, must do all the washing and ironing required for the school. If laundering for employés is done in the school, it shall be paid for by them, the pay for the same to be given to the girls and the laundress who perform the service, upon an agreed basis approved by the superintendent.

### Other Employés

29. Mechanics and all other employés not above named shall be assigned their duties by the superintendent, and to the duties usually appertaining to their position the superintendent may add any other duty which the good of the school may require.

30. Some employé must be required by the superintendent, in addition to his regular duties, to have charge of the ringing of bells and keeping time for the school; to see that the boys retire properly; that their clothing and persons are suitably cared for; that they are regularly bathed; that their toilet is neatly made in the morning; and that they are prompt at meals and details; and he shall keep a correct record of absentees.

31. Indians should be employed in preference to whites in positions which they are competent to fill. Every school should have one or more Indians among its employés.

### General Rules

32. Employés are expected to reside in the school buildings when quarters there are provided for them; otherwise, as near to the buildings as practicable. Employés must keep their rooms in order at all times.

33. Employés are not allowed to have pupils in their rooms except by permission of the superintendent for specified reasons.

34. No person, other than an attaché of the school, shall be allowed in any school building later than 9.30 p. m. except by special permission of the superintendent.

35. A retiring bell rung at 9 p. m. (or later during warm weather, if advisable) shall be the signal for absolute quiet in all the dormitories and adjacent rooms.

36. Every night, at irregular periods, some person or persons duly assigned to such duty must "make the rounds," visiting every portion of the school buildings and premises, to guard against fire, prevent intrusion of

:ting of the
y; see that
er, and that
:ponsible to

m all kinds
o make and

do all the
employés is
same to be
e, upon an

be assigned
ertaining to
the good of

addition to
eeping time
othing and
that their
: meals and

tions which
ire Indians

vhen quar-
uildings as

except by

allowed in
sion of the

veather, if
itories and

s duly as-
tion of the
itrusion of

unauthorized persons, and detect any improper conduct on the part of pupils or others.

37. Social dancing, card playing, gambling, profanity, and smoking are strictly prohibited in the school buildings and on the premises. Pupils are forbidden to carry concealed weapons.

38. There shall be a session of school each evening for reading, study, singing, or other exercises, at the close of which the pupils shall retire in an orderly manner to their dormitories. The employments for Saturday shall be arranged by the superintendent and matron to the best advantage of the school.

39. The Sabbath must be properly observed. There shall be a Sabbath school or some other suitable service every Sunday, which pupils shall be required to attend. The superintendent may require employés to attend and participate in all the above exercises; but any employé declining as a matter of conscience shall be excused from attending and participating in any or all religious exercises.

40. Every school should be carefully graded and pupils should be classified according to their capacity and scholarship and be promoted from grade to grade under such rules as may be prescribed by the superintendent. At the close of each term pupils should be examined in all the studies pursued during the term and promotions should be made on the basis of these examinations. Pupils who have completed the school course should be reported to the Indian Office for promotion to a school of higher grade.

41. All instruction must be in the English language. Pupils must be compelled to converse with each other in English, and should be properly rebuked or punished for persistent violation of this rule. Every effort should be made to encourage them to abandon their tribal language. To facilitate this work it is essential that all school employés be able to speak English fluently, and that they speak English exclusively to the pupils, and also to each other in the presence of pupils.

42. Instruction in music must be given at all schools. Singing should be a part of the exercises of each school session, and wherever practicable instruction in instrumental music should be given.

43. Except in cases of emergency, pupils shall not be removed from school either by their parents or others, nor shall they be transferred from a Government to a private school without special authority from the Indian Office.

44. The school buildings should be furnished throughout with plain, inexpensive, but substantial furniture. Dormitories or lavatories should be so supplied with necessary toilet articles, such as soap, towels, mirrors, combs, hair, shoe, nail, and tooth brushes, and wisp brooms, as to enable the pupils to form exact habits of personal neatness.

45. Good and healthful provisions must be supplied in abundance; and they must be well cooked and properly placed on the table. A regular bill of fare for each day of the week should be prepared and followed. Meals must

be served regularly and neatly. Pains should be taken not only to have the food healthful and the table attractive, but to have the bill of fare varied. The school farm and dairy should furnish an ample supply of vegetables, fruits, milk, butter, cottage cheese, curds, eggs, and poultry. Coffee and tea should be furnished sparingly; milk is preferable to either, and children can be taught to use it. Pupils must be required to attend meals promptly after proper attention to toilet, and at least one employé must be in the dining room during each meal to supervise the table manners of the pupils and to see that all leave the table at the same time and in good order.

46. The superintendent will establish a common mess for the employés and may prescribe rules governing the same. Their meals may be prepared by the school cook, if such work will not interfere with the proper discharge of her regular duties, and she shall receive from the members of the mess a fair allowance for the extra duty thus imposed upon her, such allowance to be divided among them pro rata; or they may hire a cook who is not a school employé. The matron, under the direction of the superintendent, may have immediate charge of the employés' mess.

47. So far as practicable, a uniform style of clothing for the school should be adopted. Two plain, substantial suits, with extra pair of trousers for each boy, and three neat, well-made dresses for each girl, if kept mended, ought to suffice for week-day wear for one year. For Sunday wear each pupil should be furnished a better suit. The pupils should also be supplied with underwear adapted to the climate, with night clothes, and with handkerchiefs, and, if the climate requires it, with overcoats or cloaks and with overshoes.

48. The buildings, outhouses, fences, and walks should at all times be kept in thorough repair. Where practicable, the grounds should be ornamented with trees, grass, and flowers.

49. There should be a flag staff at every school, and the American flag should be hoisted, in suitable weather, in the morning and lowered at sunset daily.

50. Special hours should be allotted for recreation. Provision should be made for outdoor sports, and the pupils should be encouraged in daily healthful exercise under the eye of a school employé; simple games should also be devised for indoor amusement. They should be taught the sports and games enjoyed by white youth, such as baseball, hopscotch, croquet, marbles, bean bags, dominoes, checkers, logomachy, and other word and letter games, and the use of dissected maps, etc. The girls should be instructed in simple fancy work, knitting, netting, crocheting, different kinds of embroidery, etc.

51. Separate play grounds, as well as sitting rooms, must be assigned the boys and the girls. In play and in work, as far as possible, and in all places except the school room and at meals, they must be kept entirely apart. It should be so arranged, however, that at stated times, under suitable supervision, they may enjoy each other's society; and such occasions should be used

to teach them to show each other due respect and consideration, to behave without restraint, but without familiarity, and to acquire habits of politeness, refinement, and self-possession.

52. New Year's Day, Franchise Day (February 8), Washington's Birthday (February 22), Arbor Day, Decoration Day (May 30), Fourth of July, Thanksgiving Day, and Christmas, are to be appropriately observed as holidays.

53. Corporal punishment must be resorted to only in cases of grave violations of rules, and in no instances shall any person inflict it except under the direction of the superintendent, to whom all serious questions of discipline must be referred. Employés may correct pupils for slight misdemeanors only.

54. Any pupil twelve years of age or over, guilty of persistently using profane or obscene language; of lewd conduct; stubborn insubordination; lying; fighting; wanton destruction of property; theft; or similar misbehavior, may be punished by the superintendent either by inflicting corporal punishment or imprisonment in the guardhouse; but in no case shall any unusual or cruel or degrading punishment be permitted.

55. A permanent record should be kept on file at each school showing the history of each pupil, giving name, age, sex, height, weight, chest measurements, state of health, residence, names of parents, and of tribe to which the family belongs, time of entering and leaving school, and the advancement made in education. If an English name is given to the pupil, the Indian name of the father should be retained as a surname.

*Industrial Work*

56. A regular and efficient system of industrial training must be a part of the work of each school. At least half of the time of each boy and girl should be devoted thereto—the work to be of such character that they may be able to apply the knowledge and experience gained, in the locality where they may be expected to reside after leaving school. In pushing forward the school-room training of these boys and girls, teachers, and especially superintendents, must not lose sight of the great necessity for fitting their charges for the every-day life of their after years.

57. A farm and garden, if practicable an orchard also, must be connected with each school, and especial attention must be given to instruction in farming, gardening, dairying, and fruit growing.

58. Every school should have horses, cattle, swine, and poultry, and when practicable, sheep and bees, which the pupils should be taught to care for properly. The boys should look after the stock and milk the cows, and the girls should see to the poultry and the milk.

59. The farm, garden, stock, dairy, kitchen, and shops should be so managed as to make the school as nearly self-sustaining as practicable, not only because Government resources should be as wisely and carefully utilized as private resources would be, but also because thrift and economy

are among the most valuable lessons which can be taught Indians. Waste in any department must not be tolerated.

60. The blacksmith, wheelwright, carpenter, shoemaker, and harness maker trades, being of the most general application, should be taught to a few pupils at every school. Where such mechanics are not provided for the school pupils should, so far as practicable, receive instruction from the agency mechanics.

61. The girls must be systematically trained in every branch of housekeeping and in dairy work; be taught to cut, make, and mend garments for both men and women; and also be taught to nurse and care for the sick. They must be regularly detailed to assist the cook in preparing the food and the laundress in washing and ironing.

62. Special effort must be made to instruct Indian youth in the use and care of tools and implements. They must learn to keep them in order, protect them properly, and use them carefully.

63. Pupils should be detailed to such work as they will probably have to do after leaving school. Neither girls nor boys must be compelled to perform duties unsuitable to their sex, age, or strength. Therefore, except when necessary, boys should not be assigned to ordinary kitchen duties, though they can be very properly required to keep their own dormitories in perfect order. The work should be so arranged as not to be irksome or discouraging. The details of pupils should be so planned that school-room and other duties will not clash; and so that they will know their duties for each hour in the day. While each one should acquire skill in some special line, his work should be varied enough to give him an acquaintance with other branches.

### Removals and Appointments

64. Persons in the Indian school service are engaged with the distinct understanding that character, merit, efficiency, and special qualifications for the work required, are the only considerations upon which they can hope to be retained. Removals will be made for cause, such as immorality, incompetency, indolence, flagrant infirmities of temper, and neglect of or refusal to perform duty, and also for manifest physical disability. An adverse report of any officer of the Department to whom the Indian Office has a right to turn for information regarding the conduct of the schools, shall be sufficient cause for suspension or removal of any school employe. Special investigations will not be ordered at the request of employes dismissed or suspended, but the office will carefully weigh any charges made against employes and take action only after due deliberation.

65. When an agent is of the opinion that the superintendent or any other school employe is not a fit person for the place he holds, or is not adapted to perform its duties, the agent must make written report of the fact to the Commissioner, stating specifically his reasons for his opinion. And when the superintendent of any Government school is of the opinion that any

employé thereof is not efficient, or is not adapted to the work required of him, it shall be the duty of said superintendent to report the fact in writing to the agent, stating specifically his reasons for the opinion. The agent must forward this report to the Commissioner, with such recommendations in relation thereto as he may deem it his duty to make.

65a. The agent shall not suspend any superintendent or other school employé without authority first obtained from the Commissioner, except when the moral welfare or the discipline of the school imperatively demands summary action, in which case he may suspend such employé and select a competent person to perform his duties temporarily, reporting immediately to the Commissioner full and specific reasons for the action taken.

65b. All positions and salaries expire June 30 of each year, and all appointments are made with this understanding. Therefore the Indian Office is not committed to any employé beyond the date named; but the office aims to retain competent and satisfactory employés from year to year, if the positions in which they are employed are continued, and whenever practicable to promote to higher grades those who have distinguished themselves by devotion to duty or special aptitude.

66. Many of the school employés will naturally and properly be nominated by the agent, though the Indian Office reserves the right to appoint or remove all employés. In making selection of school employés the agent should in all cases consult with the superintendent and, if possible, act in harmony with him. Care must be taken to secure persons of proper qualifications, good moral character, special fitness for the duties to be performed, and those who are able to speak the English language fluently and correctly. Personal and political considerations should not enter into the question. For teachers men and women especially trained for their work, with experience in teaching in public schools, who have been educated in American schools, should be given the preference. A certificate to teach in some State or Territorial school, or a normal school diploma, should accompany a recommendation for appointment as teacher or superintendent. In transmitting nominations the agent must forward at the same time evidences of the qualifications of proposed employés.

67. While no test of religious faith or affiliations shall be applied in the appointment of persons in the Indian school service or in their removal therefrom, yet every employé is required to have a decent respect for religion and to be of good moral character. In addition to recognized efficiency and general usefulness, a character which Indian children can imitate to advantage is also essential. Profanity, obscenity, indifference to moral restraints, and infirmities of temper can not be tolerated. Men and women in the Indian-school service are expected to be models of our Christian civilization, and if guilty of conduct which shocks the moral sense of a civilized community they will be summarily discharged.

68. Finally, employés at Government boarding schools must understand

when they accept appointment that hard work is to be performed; that long hours of service are required; that in the nature of things every employé must be willing to work night or day if special emergencies arise; that the duties of an employé do not end arbitrarily at a given hour, but may be continued indefinitely; and it must be understood by any individual entering the service that additional duties, or duties entirely different from those usually attaching to the position to which he or she is regularly assigned, may be required. There is no room for shirks or unwilling workers in the Indian-school service, and the man or woman who is too fastidious to assist in making a camp Indian child or youth tidy in appearance; too indifferent to participate in the general exercises of the school; too obstinate to yield to the judgment of those charged with directing the school work, should not enter it, for efficiency and success can come only to those who are interested in the education of the Indian, physically able for the arduous duties to be performed, and, above all else, willing to do whatever is necessary for the good of all concerned.

## TRAINING SCHOOLS

69. Superintendents of industrial training schools report to the Commissioner of Indian Affairs direct. They have entire control of schools under their charge, subject to the regulations of the Indian Office and special instructions of the Commissioner of Indian Affairs. As bonded officers they are responsible for all Government property under their charge. They are authorized to establish such special regulations regarding the details of their school work as circumstances may require; to determine the duties of all employés; to direct the work of the school in all its departments; to administer discipline; to be accountable for money earned by pupils, and to prescribe rules governing its expenditure by pupils, and in general to manage the affairs of the institution; but they shall neither nullify nor modify any order of the Indian Office nor any of the general regulations governing Indian schools, except by permission of the Commissioner of Indian Affairs.

## DAY SCHOOLS

70. The day schools on each reservation are under the immediate control of the agent. Where there is no supervisor the agent is required to visit each school at least once in two months. He shall see that proper school furniture and appliances, and an abundance of fuel and good water are provided, and contribute in every way possible to the efficiency of the schools. He will report from time to time with regard to the character of the work done at each school, and the efficiency of each teacher. He will spare no reasonable efforts to keep the schools filled with Indian pupils, and strive to unite

teachers, agency employés, and parents in a common interest in their welfare.

71. The supervisor of day schools upon any reservation shall be constantly in the field visiting schools, teachers, and parents, directing the details of the work, consulting with the teachers, urging parents to send their children to the schools, and performing such other duties in connection with the schools as the Commissioner of Indian Affairs or the agent may direct. He shall report weekly to the agent, and on the last day of each month shall transmit to the Indian Office, through the agent, a report of the work for the month, making recommendations relative thereto.

72. Each teacher will be expected to classify pupils, so far as practicable according to the prescribed course of study.

73. Each teacher must prepare and follow a regular program of exercises, interspersing study and recitations with singing, calisthenics, and intermissions. As most day-school work will be of a primary grade, instructions will be given by slate, blackboard and chart exercises, object lessons and picture talks in English more than by the use of text books. The teacher is expect to stimulate and encourage pupils, and must therefore give to her school intelligent, earnest attention, and use skill and ingenuity in adapting usual methods to the instruction of children who must acquire the language in which they are taught.

74. A session of a day school is five and one-half hours, exclusive of intermissions. A session begins at 9 o'clock and continues until 4 p. m., unless otherwise authorized, with two intermissions of fifteen minutes each, and one of one hour. Sessions must be held on each day of the week, Saturdays, Sundays, and legal holidays excepted.

75. Corporal punishment is allowed only in cases of gravest misconduct, and must never be inflicted by one pupil upon another at the instance or request of the teacher.

76. School rooms are under the control of the teacher, who is authorized to detail pupils to care for the same, but the agent is responsible for the buildings and public property therein. If there be an assistant teacher the assistant shall have supervision of this part of the school work, and shall perform such other school duties as may be assigned by the teacher. The assistant teacher shall not be required to perform personal service for the teacher.

77. So far as practicable a man and wife shall be employed as teacher and assistant teacher, and where they are so employed they shall arrange the school-room work so as to combine industrial training with the study of books, the man teaching industries to the boys and the woman to the girls, the object being to fit each sex for the duties likely to be incumbent upon them in after life. Even where there is but one teacher some industrial training is possible and should be included in the course of instruction.

78. The day-school teacher, being frequently the only white person in an

Indian camp, is expected to be exemplary in conduct and character, and if otherwise can not be continued in service.

79. All the preceding rules relating to boarding schools, the conduct of school employés, and their relations to the agent, shall be in force at day schools so far as applicable.

### LEAVES OF ABSENCE

*Boarding Schools*

1. All positions and salaries in the Indian-school service terminate absolutely June 30 of each year.

2. Should any position not be authorized for the ensuing fiscal year, the incumbent of such position is of course relieved from duty June 30, and has no claim against the Government for remuneration after that period.

3. No employé can claim leave of absence with pay as a matter of right, as there is no law regulating the matter. Such leaves are regulated by the Commissioner of Indian Affairs, under instructions from the Secretary of the Interior, according to the best interests of the service, and they are allowed only for good reasons, not as a matter of course.

4. Leaves of absence are to be taken when the services of employés can be spared with least detriment to the interests of the school.

5. Leaves of absence are, whether from sickness or other causes, during the school year, will be granted upon direction of the Secretary of the Interior by the Commissioner of Indian Affairs only.

6. Leaves of absence during the months when the school is in vacation are authorized in the discretion of the agent or (in the case of a bonded school) the superintendent, such leaves not to exceed three days for each month of service, nor to exceed thirty days in any fiscal year. The time of granting these leaves is left to the agent or superintendent, who will so arrange the same that the necessary work of the schools may be continued through the vacation. If, for instance, the employé entered upon duty October 1 and was in continuous service until June 30 following, his continuous service represents nine months, and consequently he may be granted nine times three days' leave with pay, which is twenty-seven days' leave. Ten or more months' service would give thirty days' leave, the annual limit.

7. Agents and superintendents of bonded schools are cautioned against favoritism in the granting of leaves of absence, and at proper times they must report fully the dates of leaves granted under these regulations. Leaves granted to employés in advance of the receipt of information as to what positions will be authorized during the next fiscal year must be granted with the explicit understanding that should the services of such employés terminate for any cause prior to the expiration of such leaves, the leaves would expire with the termination of service.

*Day Schools*

8. Beginning July 1, 1891, the school year for day schools will be ten

# APPENDIX "C"

...der colour of a law which is
... repugnant to the Constitu-
...and laws of the United States,
...erefore, to be reversed and an-

...4-36, 558-63.]

...dian Affairs

*...harged with the direction*
*...ucceeded the head of the*
*...war in 1824. The name*
*...nto the Indian country.*

...ed out of any money in the ...

*...nd be it further enacted,* That
...and vouchers for claims and
...s connected with Indian affairs,
...mitted to the said commissioner
...tive examination, and by him
...proper accounting officer of ...
Department for settlement and ...
...packages to and from the said ...
...touching the business of his ...
...free of postage.

*...be it further enacted,* That no ...
...shall be hereafter introduced ...
...rence, into the Indian country ...
...be it further enacted,* That the ...
War shall, under the direction ...
...ent, cause to be discontinued ...
...r such agents, sub-agents, ...
...d mechanics, as may, from time ...
...ne unnecessary, in consequence ...
...ation of the Indians, or other ...

*...ntes at Large. —504.]*

...e Indian Race

*...or of Indian affairs.*

*...an affairs submitted to ...*
*...to the secretary of war he ...*
*...f the States. Especially in ...*

...n which blood has been ...
...f the obligation imposed ...
...e of the United States, or ...

preservation of peace and tranquillity among
them. The instigators of such unwarrantable
proceedings, as well as the chief actors in eve-
ry instance of ascertained outrage, are justly
considered responsible to the Government
for the transgression, and are invariably re-
quired to be given up to its authority to an-
swer for the offences.

It is difficult to restrain such aggressions,
growing out of ancient feuds, prompted by
an unchecked spirit of rapine, and a thirst for
warlike distinction, and, particularly, when
probable impunity furnishes an additional
incentive. To prevent outrage is, however,
far better than to punish the offenders; nor
should the expense attendant on the remedy
to be found in the employment of a suffi-
cient body of mounted rangers preclude its
exercise. A display of military force, and the
certainty of speedy punishment, can alone
prevent a ready resort to rapine and blood-
shed on the part of those who recognize no
restraint on plunder, no bounds to the grat-
ification of revenge.

On the whole, it may be matter of serious
doubt whether, even with the fostering care
and assured protection of the United States,
the preservation and perpetuity of the Indian
race are at all attainable, under the form of
government and rude civil regulations sub-
sisting among them. These were perhaps well
enough suited to their condition, when hunt-
ing was their only employment, and war gave
birth to their strongest excitements. The un-
restrained authority of their chiefs, and the
irresponsible exercise of power, are of the

simplest elements of despotic rule: while the
absence of the *meum* and *tuum* in the general
community of possessions, which is the grand
conservative principle of the social state, is a
perpetual operating cause of the *vis inertiae*
of savage life. The stimulus of physical ex-
ertion and intellectual exercise, contained in
this powerful principle, of which the Indian
is almost entirely void, may not unjustly be
considered the parent of all improvements,
not merely in the arts, but in the profitable
direction of labor among civilized nations.
Among them it is the source of power; with
the Indians, the absence of it is the cause of
want, and consequently of decrease of num-
bers. Nor can proper notions of the social
system be successfully inculcated, nor its ben-
efits be rightly appreciated, so as to overcome
the habits and prejudices incident to savage
birth, and consequent associations of maturer
years, except by the institution of separate
and secure rights in the relations of prop-
erty and person. It is therefore suggested,
whether the formation of a code of laws on
this basis, to be submitted for their adoption,
together with certain modifications of the
existing political system among them, may
not be of very salutary effect, especially as
co-operating with the influences derivable
from the education of their youth, and the
introduction of the doctrines of the christian
religion; all centering in one grand object—
the substitution of the social for the savage
state.

*House Executive Document* no. 1, 23
Cong., 2d sess., serial 233, p. 165.

### 4.   Trade and Intercourse Act

June 30, 1834

*The trade codification of the Trade and Intercourse Act was passed by Congress in
1834. It offered no sharp break into the past but immediately, sometimes in modified
form, the principles that had accumulated through the preceding decades. The House
Committee on Indian Affairs, from which is the bill cited heavily in a report
submitted in 1829 by Lewis Cass and William Clark.*

...on act to regulate trade and intercourse with
*the Indian tribes, and to preserve peace on the
frontiers.*

*Be it enacted...* That all that part of
the United States west of the Mississippi,
and not within the states of Missouri and

Louisiana, or the territory of Arkansas, and
also, that part of the United States east of
the Mississippi river, and not within any
state to which the Indian title has not been
extinguished, for the purposes of this act, be
taken and deemed to be the Indian country.

SEC. 2. *And be it further enacted,* That no

persons shall be permitted to trade with any of the Indians (in the Indian country) without a license therefor from a superintendent of Indian affairs, or Indian agent, or sub-agent, which license shall be issued for a term not exceeding two years for the tribes east of the Mississippi, and not exceeding three years for the tribes west of that river. And the person applying for such license shall give bond in a penal sum not exceeding five thousand dollars, with one or more sureties, to be approved by the person issuing the same, conditioned that such person will faithfully observe all the laws and regulations made for the government of trade and intercourse with the Indian tribes, and in no respect violate the same. And the superintendent of the district shall have power to revoke and cancel the same, whenever the person licensed shall, in his opinion, have transgressed any of the laws or regulations provided for the government of trade and intercourse with the Indian tribes, or that it would be improper to permit him to remain in the Indian country. And no trade with the said tribes shall be carried on within their boundary, except at certain suitable and convenient places, to be designated from time to time by the superintendents, agents, and sub-agents, and to be inserted in the license. And it shall be the duty of the persons granting or revoking such licenses, forthwith to report the same to the commissioner of Indian affairs, for his approval or disapproval.

SEC. 3. *And be it further enacted.* That any superintendent or agent may refuse an application for a license to trade, if he is satisfied that the applicant is a person of bad character, or that it would be improper to permit him to reside in the Indian country, or if a license, previously granted to such applicant has been revoked, or a forfeiture of his bond decreed. But an appeal may be had from the agent or the superintendent, to the commissioner of Indian affairs; and the President of the United States shall be authorized, whenever in his opinion the public interest may require the same, to prohibit the introduction of goods, or of any particular article, into the country belonging to any Indian tribe, and to direct all licenses to trade with such tribe to be revoked, and all applications therefor to be rejected, and no trader to any other tribe shall, so long as such prohibition

may continue, trade with any Indians of ... for the tribe against which such prohibition ... is issued.

SEC. 4. *And be it further enacted.* That ... person other than an Indian who shall ... tempt to reside in the Indian country ... trader, or to introduce goods, or to tra... therein without such license, shall forfei... merchandise offered for sale to the India... or found in his possession, and shall mo... over forfeit and pay the sum of five hund... dollars.

SEC. 5. *And be it further enacted.* That ... license to trade with the Indians shall ... granted to any persons except citizens of t... United States: *Provided,* That the Presid... shall be authorized to allow the employm... of foreign boatmen and interpreters, und... such regulations as he may prescribe.

SEC. 6. *And be it further enacted.* That ... a foreigner shall go into the Indian cou... try without a passport from the War D... partment, the superintendent, agent, or su... agent of Indian affairs, or from the office... the United States commanding the neares... military post on the frontiers, or shall rem... intentionally therein after the expiration o... such passport, he shall forfeit and pay the su... of one thousand dollars; and such passpo... shall express the object of such person, t... time he is allowed to remain, and the rou... he is to travel.

SEC. 7. *And be it further enacted.* That ... any person other than an Indian, shall, with... the Indian country, purchase or receive of an... Indian, in the way of barter, trade, or pledge... a gun, trap, or other article commonly used ... in hunting, any instrument of husbandry ... or cooking utensils of the kind commonly ... obtained by the Indians in their intercourse ... with the white people, or any other article of ... clothing, except skins or furs, he shall forfeit ... and pay the sum of fifty dollars.

SEC. 8. *And be it further enacted.* That if any ... person, other than an Indian, shall, within ... the limits of any tribe with whom the United ... States shall have existing treaties, hunt, or ... trap, or take and destroy, any peltries or ... game, except for subsistence in the Indian ... country, such person shall forfeit the sum of ... five hundred dollars, and forfeit all the traps, ... guns, and ammunition in his possession, used ... or procured to be used for that purpose, and ... peltries so taken.

SEC. 9. *And be it ...*
... person shall driv...
... stock of horses, m...
... feed on any land l...
... Indian tribe, witho...
... tribe, such person sha...
... lar for each anima...
SEC. 10. *And be it n...*
... perintendent of Ind...
... nts and sub-agent...
... remove from the ...
... found therein c...
... sident of the Uni...
... direct the military ...
... ch removal.
SEC. 11. *And be ...*
... f any person shall ...
... any lands belonging...
... treaty with the Unite...
... tribe, or shall surve...
... urvey such lands, o...
... boundaries by mark...
... such offender shall fo...
... one thousand dollars ...
... be lawful for the P...
... States to take such m...
... such military force, as ...
... to remove from the ...
... such person as afore...
SEC. 12. *And be it ...*
... purchase, grant, lease,...
... lands, or of any othe...
... any Indian nation o...
... be of any validity in ...
... same be made by ...
... tered into pursuant ...
... of any person, not s...
... thority of the United ...
... negotiate such treat...
... or indirectly, to grea...
... or tribe of Indians, ...
... of any lands by them ...
... person shall forfeit ...
... dollars: *Provided, nev...*
... lawful for the agent ...
... may be present at an...
... ons under the authori...
... in the presence and ...
... the commissioner ...
... United States appoi...
... propose to, and sub...
... compensation to su...
... lands within such st...
... guished by treaty.

ue, trade with any Indian
against which such prohib

*nd be it further enacted*, That
r than an Indian who shall
side in the Indian country
introduce goods, or to
out such license, shall forfe
offered for sale to the Indi
his possession, and shall m
nd pay the sum of five hund

*d be it further enacted*, That
de with the Indians shall
persons except citizens of
Provided, That the Presi
rized to allow the employ
tmen and interpreters, un
ns as he may prescribe.
*be it further enacted*. Tha
all go into the Indian c
passport from the War
uperintendent, agent, or
affairs, or from the office
res commanding the nea
the frontiers, or shall re
erein after the expiration
e shall forfeit and pay the
 dollars; and such pass
object of such person,
ed to remain, and the

*e it further enacted*. Tha
han an Indian shall, w
purchase or receive of
or barter, trade, or pled
ther article commonly
instrument of husban
ils of the land common
ndians in their intercou
ols, or any other article
uns or furs, he shall for
 fifty dollars.

*rther enacted*, That if am
 an Indian, shall, virtu
e with whom the Unite
essing treaties, hunt, or
destroy, any peltries or
ubsistence in the Indian
n shall forfeit the sum of
and forfeit all the good
on in his possession, used
ed for that purpose, and

Sec. 9. *And be it further enacted*. That if
 person shall drive, or otherwise convey
 stock of horses, mules, or cattle, to range
 feed on any land belonging to any Indian
 Indian tribe, without the consent of such
 such person shall forfeit the sum of one
 r for each animal of such stock.

Sec. 10. *And be it further enacted*, That the
 intendent of Indian affairs, and Indian
 s and sub-agents, shall have authority
 move from the Indian country all per-
 found therein contrary to law; and the
 dent of the United States is authorized
 ct the military force to be employed in
 removal.

Sec. 11. *And be it further enacted*, That
 y person shall make a settlement on
 ands belonging, secured, or granted by
 y with the United States to any Indian
 or shall survey or shall attempt to
 y such lands, or designate any of the
 daries by marking trees, or otherwise.
 offender shall forfeit and pay the sum of
 thousand dollars. And it shall, moreover,
 wful for the President of the United
 s to take such measures, and to employ
 military force, as he may judge necessary
 remove from the lands as aforesaid any
 ch person as aforesaid.

Sec. 12. *And be it further enacted*. That no
 chase, grant, lease, or other conveyance of
 ds, or of any title or claim thereto, from
 y Indian nation or tribe of Indians, shall
 e of any validity in law or equity, unless the
 me be made by treaty or convention en-
 ared into pursuant to the constitution. And
 if any person, not employed under the au-
 thority of the United States, shall attempt to
 negotiate such treaty or convention, directly
 or indirectly, to treat with any such nation
 or tribe of Indians, for the title or purchase
 of any lands by them held or claimed, such
 person shall forfeit and pay one thousand
 dollars; *Provided, nevertheless*. That it shall be
 awful for the agent or agents of any state who
 may be present at any treaty held with Indi-
 ans under the authority of the United States,
 in the presence and with the approbation of
 the commissioner or commissioners of the
 United States appointed to hold the same, to
 propose to, and adjust with, the Indians, the
 compensation to be made for their claim to
 lands within such state, which shall be extin-
 guished by treaty.

Sec. 13. *And be it further enacted*. That if
 any citizen or other person residing within
 the United States or the territory thereof,
 shall send any talk, speech, message, or letter
 to any Indian nation, tribe, chief, or individ-
 ual, with an intent to produce a contravention
 or infraction of any treaty or other law of the
 United States, or to disturb the peace and
 tranquillity of the United States, he shall for-
 feit and pay the sum of two thousand dollars.

Sec. 14. *And be it further enacted*. That if
 any citizen, or other person, shall carry or
 deliver any such talk, message, speech, or
 letter, to or from any Indian nation, tribe,
 chief, or individual, from or to any person
 or persons whatsoever, residing within the
 United States, or from or to any subject,
 citizen, or agent of any foreign power or state,
 knowing the contents thereof, he shall forfeit
 and pay the sum of one thousand dollars.

Sec. 15. *And be it further enacted*. That if
 any citizen or other person, residing or living
 among the Indians, or elsewhere within the
 territory of the United States, shall carry on a
 correspondence, by letter or otherwise, with
 any foreign nation or power, with an intent to
 induce such foreign nation or power to excite
 any Indian nation, tribe, chief, or individual,
 to war against the United States, or to the
 violation of any existing treaty; or in case
 any citizen or other person shall alienate, or
 attempt to alienate, the confidence of any
 Indian or Indians from the government of
 the United States, he shall forfeit the sum of
 one thousand dollars.

Sec. 16. *And be it further enacted*. That
 where, in the commission, by a white per-
 son, of any crime, offence, or misdemeanor,
 within the Indian country, the property of
 any friendly Indian is taken, injured or de-
 stroyed, and a conviction is had for such
 crime, offence, or misdemeanor, the person
 so convicted shall be sentenced to pay to such
 friendly Indian to whom the property may
 belong, or whose person may be injured, a
 sum equal to twice the just value of the prop-
 erty so taken, injured, or destroyed, and if
 such offender shall be unable to pay a sum
 at least equal to the just value or amount,
 whatever such payment shall fall short of the
 same shall be paid out of the treasury of the
 United States; *Provided*, That no such Indian
 shall be entitled to any payment, out of the
 treasury of the United States, for any such

42

3

property, if he, or any of the nation to which
he belongs, shall have sought private revenge,
or attempted to obtain satisfaction by any
force or violence: *And provided, also,* That if
such offender cannot be apprehended and
brought to trial, the amount of such property
shall be paid out of the treasury, as aforesaid.

SEC. 17. *And be it further enacted,* That if
any Indian or Indians, belonging to any tribe
in amity with the United States, shall, within
the Indian country, take or destroy the prop-
erty of any person lawfully within such coun-
try, or shall pass from the Indian country into
any state or territory inhabited by citizens
of the United States, and there take, steal,
or destroy, any horse, horses, or other prop-
erty, belonging to any citizen or inhabitant of
the United States, such citizen or inhabitant,
his representative, attorney, or agent, may
make application to the proper superinten-
dent, agent, or sub-agent, who, upon being
furnished with the necessary documents and
proofs, shall, under the direction of the Pres-
ident, make application to the nation or tribe
to which said Indian or Indians shall belong,
for satisfaction: and if such nation or tribe
shall neglect or refuse to make satisfaction,
in a reasonable time, not exceeding twelve
months, it shall be the duty of such superin-
tendent, agent, or sub-agent, to make return
of his doings to the commissioner of Indian
affairs, that such further steps may be taken
as shall be proper, in the opinion of the Presi-
dent, to obtain satisfaction for the injury: and,
in the mean time, in respect to the property so
taken, stolen or destroyed, the United States
guaranty, to the party so injured, an even-
tual indemnification: *Provided,* That, if such
injured party, his representative, attorney, or
agent, shall, in any way, violate any of the pro-
visions of this act, by seeking or attempting
to obtain private satisfaction or revenge, he
shall forfeit all claim upon the United States
for such indemnification: *and provided, also,*
That, unless such claim shall be presented
within three years after the commission of
the injury, the same shall be barred, and, if
the nation or tribe to which such Indian may
belong, receive, in annuity from the United
States, such claim shall, at the next payment
of the annuity, be deducted therefrom, and
paid to the party injured: and, if no annuity
is payable to such nation or tribe, then the
amount of the claim shall be paid from the

treasury of the United States: *Provided,* Th...
nothing herein contained shall prevent the
legal apprehension and punishment of an...
Indians having so offended.

SEC. 18. [Depositions of witnesses.]

SEC. 19. *And be it further enacted,* Th...
it shall be the duty of the superintenden...
agents, and sub-agents, to endeavour to pro...
cure the arrest and trial of all Indians accuse...
of committing any crime, offence, or misd...
meanor, and all other persons who may hav...
committed crimes or offences within an...
state or territory, and have fled into the India...
country, either by demanding the same of t...
chiefs of the proper tribe, or by such othe...
means as the President may authorize: an...
the President may direct the military forc...
of the United States to be employed in th...
apprehension of such Indians, and also, i...
preventing or terminating hostilities betwee...
any of the Indian tribes.

SEC. 20. *And be it further enacted,* Th...
if any person shall sell, exchange, or giv...
barter, or dispose of, any spirituous liquo...
or wine to an Indian, (in the Indian coun...
try,) such person shall forfeit and pay th...
sum of five hundred dollars: and if any per...
son shall introduce, or attempt to introduce...
any spirituous liquor or wine into the India...
country, except such supplies as shall be nec...
essary for the officers of the United States...
and troops of the service, under the direction...
of the War Department, such person shall...
forfeit and pay a sum not exceeding three...
hundred dollars: and if any superintendent...
of Indian affairs, Indian agent, or sub-agent...
or commanding officer of a military post, has...
reason to suspect, or is informed, that any...
white person or Indian is about to introduce...
or has introduced, any spirituous liquor or...
wine into the Indian country, in violation...
of the provisions of this section, it shall be...
lawful for such superintendent, Indian agent...
or sub-agent, or military officer, agreeably to...
such regulations as may be established by the...
President of the United States, to cause the...
boats, stores, packages, and places of deposit...
of such person to be searched, and if any such...
spirituous liquor or wine is found, the boats...
boats, packages, and peltries of such persons...
shall be seized and delivered to the proper...
officer, and shall be proceeded against by libel...
in the proper court, and forfeited, one-half...
to the use of the informer, and the other half...

...to the use of...
person is a tra...
and his bond p...
...be lawful for a...
United States.
...destroy any an...
Indian country...
mentioned in...
SEC. 21. *An...*
...any person wh...
...the Indian c...
artillery for m...
shall forfeit an...
dollars; and it...
...tendent of In...
sub-agent, with...
the same shall...
with to destroy...
it shall be lawf...
of the United S...
SEC. 22. *And...*
...trials about the...
Indian may be a...
person on the...
shall rest upon...
the Indian shal...
title in himsel...
possession or o...
SEC. 23. *An...*
it shall be law...
the United Sta...
manner and in...
President may...
every person w...
the Indian cour...
provisions of th...
to convey from...
nearest conven...
civil authority...
district in whic...
to be proceede...
law: and also, in...
of stores, pack...
by the twenty...
preventing the...
property into...
to law: which...
proceeded agai...
That no perso...
force is stores...
than five days...
removal. And...
may have any...
custody shall re...

43

the United States: *Provided*, Th...
...erein contained shall prevent th...
...rehension and punishment of ...
...ving so offended.

[Depositions of witnesses.]

...*And be it further enacted*, Th...
...the duty of the superintendent...
...sub-agents, to endeavour to pro...
...rest and trial of all Indians accuse...
...ing any crime, offence, or misde...
...d all other persons who may ha...
...crimes or offences within an...
...tory, and have fled into the India...
...ther by demanding the same of th...
...proper tribe, or by such oth...
...President may authorize; an...
...nt may direct the military for...
...ted States to be employed in t...
...n of such Indians, and also, i...
...r terminating hostilities betwee...
...ndian tribes.

...*And be it further enacted*. Th...
...n shall sell, exchange, or giv...
...spose of, any spirituous liquo...
...n Indian. (In the Indian coun...
...erson shall forfeit and pay...
...undred dollars: and if any per...
...roduce, or attempt to introduce...
...s liquor or wine into the India...
...pt such supplies as shall be nec...
...le officers of the United State...
...the service, under the direction...
...Department, such person shal...
...v a sum not exceeding three...
...ars; and if any superintenden...
...rs, Indian agent, or sub-agent...
...ng officer or a military post, has...
...pect, or is informed, that an...
...r Indian is about to introduce...
...uced, any spirituous liquor or...
...e Indian country, in violation...
...ons of this section, it shall be...
...h superintendent. Indian agent...
...r military officer, aggressive to...
...ns as may be established by the...
...he United States, to cause the...
...packages, and places of deposit...
...to be searched, and if any such...
...uor or wine is found, the goods...
...s, and settees of such persons...
...nd delivered to the proper...
...l be proceeded against in the...
...ourt, and forfeited, one-half...
...e informer, and the other half...

to the use of the United States: and if such
person is a trader, his license shall be revoked
and his bond put in suit. And it shall moreover
be lawful for any person, in the service of the
United States, or for any Indian, to take and
destroy any ardent spirits or wine found in the
Indian country, excepting military supplies as
mentioned in this section.

Sec. 21. *And be it further enacted*, That if
any person whatever shall, within the limits
of the Indian country, set up or continue any
distillery for manufacturing ardent spirits, he
shall forfeit and pay a penalty of one thousand
dollars: and it shall be the duty of the super-
intendent of Indian affairs, Indian agent, or
sub-agent, within the limits of whose agency
the same shall be set up or continued, forth-
with to destroy and break up the same: and
it shall be lawful to employ the military force
of the United States in executing that duty.

Sec. 22. *And be it further enacted*, That in all
trials about the right of property in which an
Indian may be a party on one side, and a white
person in the other, the burden of proof
shall rest upon the white person, whenever
the Indian shall make out a presumption of
title in himself from the fact of previous
possession or ownership.

Sec. 23. *And be it further enacted*, That
it shall be lawful for the military force of
the United States to be employed in such
manner and under such regulations as the
President may direct, in the apprehension of
every person who shall or may be found in
the Indian country, in violation of any of the
provisions of this act, and him immediately
to convey from said Indian country, in the
nearest convenient and safe route, to the
civil authority of the territory or judicial
district in which said person shall be found,
to be proceeded against in due course of
law: and also, in the examination and seizure
of stores, packages, and goods, authorized
by the twentieth section of this act, and in
preventing the introduction of persons and
property into the Indian country contrary
to law: which persons and property shall be
proceeded against according to law. *Provided*,
That no person apprehended by military
force is aforesaid, shall be detained longer
than the arrest, and before
removal; and if officers and soldiers who
may take any such person or persons in
custody shall treat them with all the humanity

which the circumstances will possibly permit,
and every officer or soldier who shall be
guilty of maltreating any such person while
in custody, shall suffer such punishment as a
court-martial shall direct.

Sec. 24. *And be it further enacted*, That
for the sole purpose of carrying this act into
effect, all that part of the Indian country
west of the Mississippi river, that is bounded
north by the north line of lands assigned to
the Osage tribe of Indians, produced east to
the state of Missouri: west, by the Mexican
possessions: south, by Red river: and east, by
the west line of the territory of Arkansas and
the state of Missouri, shall be, and hereby is,
annexed to the territory of Arkansas: and that
for the purpose aforesaid, the residue of the
Indian country west of the said Mississippi
river shall be, and hereby is, annexed to the
judicial district of Missouri: and for the pur-
pose aforesaid, the several portions of Indian
country east of the said Mississippi river, shall
be, and are hereby, severally annexed to the
territory in which they are situate.

Sec. 25. *And be it further enacted*, That
so much of the laws of the United States as
provides for the punishment of crimes com-
mitted within any place within the sole and
exclusive jurisdiction of the United States,
shall be in force in the Indian country: *Pro-
vided*, The same shall not extend to crimes
committed by one Indian against the person
or property of another Indian.

Sec. 26. *And be it further enacted*, That if
any person who shall be charged with a vio-
lation of any of the provisions or regulations
of this act, shall be found within any of the
United States, or either of the territories,
such offenders may be there apprehended,
and transported to the territory or judicial
district having jurisdiction of the same.

Sec. 27. *And be it further enacted*, That all
penalties which shall accrue under this act,
shall be sued for and recovered in an action
of debt, in the name of the United States,
before any court having jurisdiction of the
same, in any state or territory in which the
defendant shall be arrested or found, the one
half to the use of the informer, and the other
half to the use of the United States: except
when the prosecution shall be first instituted
on behalf of the United States, in which case
the whole shall be to their use.

Sec. 28. *And be it further enacted*, That

44



when goods or other property shall be seized for any violation of this act, it shall be lawful for the person prosecuting on behalf of the United States to proceed against such goods, or other property, in the manner directed to be observed in the case of goods, wares, or merchandise brought into the United States in violation of the revenue laws.

Sec. 29. [Repeal of previous acts.]

Sec. 30. *And be it further enacted,* That until a western territory shall be established, the two agents for the Western territory, as provided in the act for the organization of the Indian department, this day approved by the

President, shall execute the duties of agent for such tribes as may be directed by the President of the United States. And it shall be competent for the President to assign to one of the said agents, in addition to his proper duties, the duties of superintendent for such district of country or for such tribes as the President may think fit. And the powers of the superintendent at St. Louis, over such district or tribes as may be assigned to such acting superintendent, shall cease: *Provided,* That no additional compensation shall be allowed for such services.

*[U.S. Statutes at Large,* 4:729–35.]

## 49.  Organization of the Department of Indian Affairs
### June 30, 1834

*In 1834 Congress regularized the organization and operations of the superintendents and agents responsible for Indian affairs, thus eliminating much of the confusion and vagueness that had plagued the Indian service.*

*An act to provide for the organization of the department of Indian affairs.*

*Be it enacted* . . . . That the duties of the governors of the territories of Florida and Arkansas, as superintendents of Indian affairs, shall hereafter cease, and the duties of the governor of the territory of Michigan, as superintendent of Indian affairs, shall cease from and after the establishment of a new territory embracing the country west of Lake Michigan, should such a territory be established, and while the governor of the said territory of Michigan continues to act as superintendent of Indian affairs, he shall receive therefor, the annual sum of one thousand dollars, in full of all allowances, emoluments, or compensation for services in said capacity.

Sec. 2. *And be it further enacted,* That there shall be a superintendency of Indian affairs for all the Indian country not within the bounds of any state or territory west of the Mississippi river, the superintendent of which shall reside at St. Louis, and shall annually receive a salary of fifteen hundred dollars.

Sec. 3. *And be it further enacted,* That superintendents of Indian affairs shall, within their several superintendencies, exercise a general supervision and control over the official conduct and accounts of all officers and persons employed by the government in the Indian department, under such regulations as shall be established by the President of the United States; and may suspend such officers and persons from their office or employments, for reasons forthwith to be communicated to the Secretary of War.

Sec. 4. *And be it further enacted,* That the following Indian agents shall be appointed by the President of the United States, by and with the advice and consent of the Senate, who shall hold their offices for the term of four years, and who shall give bond, with two or more securities, in the penal sum of two thousand dollars, for the faithful execution of the same, and shall receive the annual compensation of fifteen hundred dollars.

Two agents for the Western territory.

An agent for the Chickasaws.

An agent for the eastern Cherokees.

An agent for the Florida Indians.

An agent for the Indians in the state of Indiana.

An agent at Chicago.

An agent at Rock island.

An agent at Prairie du Chien.

An agent for Michilimackinac and the Saut Sainte Marie.

An agent for the Saint Peters.

An agent for the Upper Missouri.

And the following agencies shall be con-

continued at the pe[riod?] that is to say:

The Florida age[ncy until the?] thirty-first day of D[ecember?]

The Cherokee a[gency until the?] thirty-first day of D[ecember?]

The Indiana age[ncy until the?] thirty-first day of D[ecember, one hun?]dred and thirty-six.

The Chicago age[ncy until the?] thirty-first day of De[cember?]

The Rock Island [agency until?] the thirty-first day [of December, one?] hundred and thirty-[six.]

And all other agen[cies provided for in?] this act, from and a[fter . . . : *Provided,*] That the lim[itation of these agen]cies shall not be co[nstrued to prevent the?] President of the Uni[ted States from con]tinuing the same at an[y agency, where the?] President shall be, a[uthorized . . . autho?]rized, whenever he ma[y deem proper, to?] discontinue any Indi[an agency, or to transfer?] the same, from the pl[ace or tribe designated?] by law, to such othe[r place or tribe as the?] public service may re[quire; and that every?] agent shall reside and [keep his agency within?] or near the territory [of the tribe for which he?] may be agent, and at [such place as the Presi]dent may designate, a[nd shall not depart from?] the limits of his agen[cy without permission.] And it shall be compe[tent for the President?] to require any militar[y officer of the United?] States to execute the [duties of Indian agent.]

Sec. 5. *And be it [further enacted,* That a?] competent number [of sub-agents may be?] appointed by the Pre[sident, with an annual?] salary of seven hundre[d dollars each, . . . ?] to be employed, . . . [and wherever the?] President may direct . . . [shall give?] bonds, with one or mo[re securities . . . in the?] sum of one thousand [dollars, for the faithful?] execution of the same, [and . . . shall?] be appointed who [reside beyond the?] limits of any agency [for which they are?] appointed.

Sec. 6. *And be it [further enacted,* That?] nothing herein contai[ned shall be construed?] to require the re-ap[pointment of persons?] now in office, until [the expiration of their?] present term of servi[ce; . . . but the services?] of all Indian agents [and sub-agents in?] office, shall expire on t[he . . . day of . . . next?] next, unless sooner re[appointed.]

# APPENDIX "D"

360     FORTY–FIRST CONGRESS. Sess. II. Ch. 296. 1870.

R. H. Taylor for herding cattle.

by the Interior Department, June nine, eighteen hundred and sixty-nine, to R. H. Taylor, for herding cattle, three hundred and thirty-one dollars and ninety-seven cents.

Thomas P. Fenlon and James S. Emery for legal services.

For this amount, to enable the Secretary of the Interior to pay for legal services rendered by Messrs. Thomas P. Fenlon and James S. Emery, attorneys-at-law, in eighteen hundred and sixty-five, and subsequently, in defending suits instituted against the United States officers in Kansas, relating to the rights and property of Indians, by direction of the Interior Department, two thousand dollars : *Provided*, That this amount shall be received in full satisfaction for said indebtedness : *Provided*, That upon annuities and interest of trust funds provided by treaties no taxes shall in any case be assessed or collected.

Proviso. No tax upon annuities and interest under treaties.

Annuities to be expended to promote the comfort, &c. of the tribes entitled thereto. Proviso. Supplies purchased without authority not to be paid, &c. Indians to be encouraged in habits of industry and peace.

Sec. [2.] *And be it further enacted*, That in every case where annuities are provided to be paid to any Indian tribe, it shall be the duty of the Secretary of the Interior to expend the same for such objects as will best promote the comfort, civilization, and improvement of the tribe entitled to the same : *Provided*, That the consent of such tribe to such expenditures can be obtained ; and no claims for supplies for Indians purchased without authority of law shall be paid out of any appropriation for expenses of the Indian department or for Indians.

Commission of citizens to continue as long, &c., &c. 1870, ch. 42. Duty of commissioners. 1871, ch. 120. Post, p. 563. Secretary and his pay. Salaries of superintendents and agents.

Sec. [3.] *And be it further enacted*, That the Secretary of the Interior shall so exercise the discretion vested in him by this act as to encourage able-bodied Indians in habits of industry and peace, and the commission of citizens, serving without pay, appointed by the President under the provisions of the fourth section of the act of April ten, eighteen hundred and sixty-nine, is hereby continued so long as the appropriation heretofore made for their expenses shall last. And it shall be the duty of said commissioners to supervise all expenditures of money appropriated for the benefit of Indians in the United States, and to inspect all goods purchased for said Indians in connection with the commissioner of Indian affairs, whose duty it shall be to consult said commission in making purchases of such goods ; and provided that the said commission shall have power to appoint one of its number as secretary, with such reasonable compensation as they may designate ; and the sum of one hundred and twenty-five thousand dollars is hereby appropriated for the payment of salaries of superintendents and agents authorized by law.

No part of appropriation for any tribe to be used to pay claims for depredations by such tribe, &c.

Sec. [4.] *And be it further enacted*, That no part of the moneys appropriated by this act or which may hereafter be appropriated in any general act or deficiency bill making appropriations for the current and contingent expenses of the Indian department to pay annuities due to or to be used and expended for the care and benefit of any tribe or tribes of Indians named herein, shall be applied to the payment of any claim for depredations that may have been or may be committed by such tribe or tribes, or any member or members thereof ; and no claims for Indian depredations shall hereafter be paid until Congress shall make special appropriation therefor ; and all acts and parts of acts inconsistent herewith are hereby repealed.

Repeal of treaties as to not paying money to minor children of the Pottawatomies until, &c. Vol. xii. p. 1192.

Sec. [5.] *And be it further enacted*, That so much of an act entitled " An act making appropriations for the current and contingent expenses of the Indian department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June thirty, eighteen hundred and seventy," approved April ten, eighteen hundred and sixty-nine, relating to Pottawatomie Indians, as provides that no part of the money due or belonging to minor children shall be paid to them, or to any person for them, until such children shall have attained the age of twenty-one years, being in conflict with the third article of the treaty with said Indians of November fifteen, eighteen hundred and sixty-one, is modified by subsequent treaties, be, and the same is hereby, repealed.

Sec. [6.] *And be it further enacted*, That the President is and he is

APPENDIX "E"

58                    PART I. GENERAL LAWS REGULATING INDIAN AFFAIRS.

Fees to be paid from the Treasury.

And the fees to which the officers of such local land office would have been entitled had such lands been entered under the general laws for the disposition of the public lands shall be paid to them from any moneys in the Treasury of the United States not otherwise appropriated, upon a statement of an account in their behalf for such fees by the Commissioner of the General Land Office, and a certification of such account to the Secretary of the Treasury by the Secretary of the Interior.

Determination of descent.
1887, Feb. 8, c. 119, s. 5, ante, p. 34.

SEC. 5. That for the purpose of determining the descent of land to the heirs of any deceased Indian under the provisions of the fifth section of said act, whenever any male and female Indian shall have co-habited together as husband and wife according to the custom and manner of Indian life the issue of such co-habitation shall be, for the purpose aforesaid, taken and deemed to be the legitimate issue of the Indians so living together, and every Indian child, otherwise illegitimate, shall for such purpose be taken and deemed to be the legitimate issue of the father of such child:

"Cherokee Outlet" lands excepted.
1890, May 2, c. 182, s. 1, ante, p. 48.

*Provided.* That the provisions of this act shall not be held or construed as to apply to the lands commonly called and known as the "Cherokee Outlet":

Certain Sauk and Foxes exempted.

*And provided further.* That no allotment of lands shall be made or annuities of money paid to any of the Sac and Fox of the Missouri Indians who were not enrolled as members of said tribe on January first, eighteen hundred and ninety; but this shall not be held to impair or otherwise affect the rights or equities of any person whose claim to membership in said tribe is now pending and being investigated. [*February 28, 1891.*]

---

Mar. 3, 1891.
26 Stat., 826.

CHAP. 517.—An act to establish circuit courts of appeals and to define and regulate in certain cases the jurisdiction of the courts of the United States, and for other purposes.

Circuit court of appeals; jurisdiction.

*Be it enacted,* etc. * * * SEC. 2. That there is hereby created in each circuit a circuit court of appeals, which shall consist of three judges, of whom two shall constitute a quorum, and which shall be a court of record with appellate jurisdiction, as is hereafter limited and established.

*        *        *        *        *        *

[26 Stat., 229.]
Appeals, etc., from Indian Territory court.
1889, Mar. 1, c. 333, ante, p. 32.
1890, May 2, c. 182, s. 29, 30, ante, pp. 47, 48.
1895, Mar. 1, c. 145, post, p. 72.
1895, Feb. 6, c. 14, post, p. 77.

SEC. 13. Appeals and writs of error may be taken and prosecuted from the decisions of the United States court in the Indian Territory to the Supreme Court of the United States, or to the circuit court of appeals in the eighth circuit, in the same manner and under the same regulations as from the circuit or district courts of the United States, under this act. * * * [*March 3, 1891.*]

---

Mar. 3, 1891.
26 Stat., 851.

CHAP. 538.—An act to provide for the adjudication and payment of claims arising from Indian depredations.

Indian depredation claims.
Court of Claims authorized to adjudicate—

*Be it enacted,* &c. That in addition to the jurisdiction which now is, or may hereafter be, conferred upon the Court of Claims, said Court shall have and possess jurisdiction and authority to inquire into and finally adjudicate, in the manner provided in this act, all claims of the following classes, namely:

—claims for property taken by Indians at amity.
Rev. Stat., 2156.

First. All claims for property of citizens of the United States taken or destroyed by Indians belonging to any band, tribe, or nation, in amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for.

—claims examined and allowed.

Second. Such jurisdiction shall also extend to all cases which have been examined and allowed by the Interior Department.

---

B. FIFTY-FIRST CONGRESS.   SESS. II.   CH. 538.   1891.

And also to such cases as were authorized to be examined under the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June thirtieth, eighteen hundred and eighty-six, and for other purposes, approved March third, eighteen hundred and eighty-five, and under subsequent acts, subject however to the limitations hereinafter provided.

<span style="float:right">claims heretofore authorized to be examined under certain acts. 164 U. S., 658; 173 U. s., 35, 76.</span>

Third. All just offsets and counter claims to any claim of either of the preceding classes which may be before such court for determination.

<span style="float:right">Offsets and counterclaims.</span>

SEC. 2. That all questions of limitations as to time and manner of presenting claims are hereby waived, and no claim shall be excluded from the jurisdiction of the court because not heretofore presented to the Secretary of the Interior or other officer or department of the Government:

<span style="float:right">Limitations waived.</span>

Provided, That no claim accruing prior to July first, eighteen hundred and sixty-five, shall be considered by the court unless the claim shall be allowed or has been or is pending, prior to the passage of this act, before the Secretary of the Interior or the Congress of the United States, or before any superintendent, agent, sub-agent or commissioner, authorized under any act of Congress to enquire into such claims; but no case shall be considered pending unless evidence has been presented therein:

<span style="float:right">No claims to be considered accruing before July 1, 1865, unless heretofore presented, with evidence. Rev. Stat., 445, 466, etc.</span>

And provided further, That all claims existing at the time of the taking effect of this act shall be presented to the court by petition, as hereinafter provided, within three years after the passage hereof, or shall be thereafter forever barred:

<span style="float:right">Petitions to be presented within three years.</span>

And provided further, That no suit or proceeding shall be allowed under this act for any depredation which shall be committed after the passage thereof.

<span style="float:right">Future depredations not included.</span>

SEC. 3. That all claims shall be presented to the court by petition setting forth in ordinary and concise language, without unnecessary repetition, the facts upon which such claims are based, the persons, classes of persons, tribe or tribes, or band of Indians by whom the alleged illegal acts were committed, as near as may be, the property lost or destroyed, and the value thereof, and any other facts connected with the transactions and material to the proper adjudication of the case involved. The petition shall be verified by the affidavit of the claimant, his agent, administrator, or attorney, and shall be filed with the clerk of said court. It shall set forth the full name and residence of the claimant, the damages sought to be recovered, praying the court for a judgment upon the facts and the law.

<span style="float:right">Petition, what to contain. Rev. Stat., 1072.</span>

SEC. 4. The service of the petition shall be made upon the Attorney-General of the United States in such manner as may be provided by the rules or orders of said court. It shall be the duty of the Attorney-General of the United States to appear and defend the interests of the Government and of the Indians in the suit, and within sixty days after the service of the petition upon him, unless the time shall be extended by order of the court made in the case, to file a plea, answer or demurrer on the part of the Government and the Indians, and to file a notice of any counterclaim, set-off, claim of damages, demand, or defense whatsoever of the Government or of the Indians in the premises:

<span style="float:right">Service of petition upon Attorney-General, who shall defend the Government and Indians. Pleadings to be filed by Attorney-General within sixty days.</span>

Provided, That should the Attorney-General neglect or refuse to file the plea, answer, demurrer, or defense as required, the claimant may proceed with the case under such rules as the court may adopt in the premises; but the claimant shall not have judgment for his claim, or for any part thereof, unless he shall establish the same by proof satisfactory to the court:

<span style="float:right">On failure of Attorney-General to plead, claimant may proceed, but no judgement without proof.</span>

Provided, That any Indian or Indians interested in the proceedings may appear and defend, by an attorney employed by such Indian or Indians with the approval of the Commissioner of Indian Affairs, if he or they shall choose so to do.

<span style="float:right">Indians may employ special attorney.</span>

Papers on file may be read as evidence.
173 U.S., 79.
35 C. Cls. 36.

In considering the merits of claims presented to the court, any testimony, affidavits, reports of special agents or other officers, and such other papers as are now on file in the departments or in the courts, relating to any such claims, shall be considered by the court as competent evidence and such weight given thereto as in its judgment is right and proper:

Certain allowed claims to have priority.

*Provided,* That all unpaid claims which have heretofore been examined, approved, and allowed by the Secretary of the Interior, or under his direction, in pursuance of the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes, for the year ending June thirtieth, eighteen hundred and eighty-six, and for other purposes, approved March third, eighteen hundred and eighty-five, and subsequent Indian appropriation acts, shall have priority of consideration by such court.

Judgments for amounts found due unless either party reopens.

And judgments for the amounts therein found due shall be rendered, unless either the claimant or the United States shall elect to re-open the case and try the same before the court, in which event the testimony in the case given by the witnesses and the documentary evidence, including reports of Department agents therein, may be read as depositions and proofs:

Burden of proof, if case reopened.

*Provided,* That the party electing to re-open the case shall assume the burden of proof.

Rules for taking testimony to be made by court.
Rev. Stat., 1075-1086.
s. 5,24 Stat. 506.
1887, Mar. 1, c. 256.
Parties made competent.

SEC. 5. That the said court shall make rules and regulations for taking testimony in the causes herein provided for, by deposition or otherwise, and such testimony shall be taken in the county where the witness resides, when the same can be conveniently done,

And no person shall be excluded as a witness because he is party to or interested in said suit, and any claimant or party in interest may be examined as a witness on the part of the Government:

Judgment to be rendered against the United States and Indians.

That the court shall determine in each case the value of the property taken or destroyed at the time and place of the loss or destruction, and, if possible, the tribe of Indians or other persons by whom the wrong was committed, and shall render judgment in favor of the claimant or claimants against the United States, and against the tribe of Indians committing the wrong, when such can be identified.

Judgment to be charged against tribe.

SEC. 6. That the amount of any judgment so rendered against any tribe of Indians shall be charged against the tribe by which, or by

Payment made, from what funds.

members of which, the court shall find that the depredation was committed, and shall be deducted and paid in the following manner:

First, from annuities due said tribe from the United States;

Second, if no annuities are due or available, then from any other funds due said tribe from the United States, arising from the sale of their lands or otherwise;

Third, if no such funds are due or available, then from any appropriation for the benefit of said tribe, other than appropriations for their current and necessary support, subsistence and education;

And, fourth, if no such annuity, fund, or appropriation is due or available, then the amount of the judgment shall be paid from the Treasury of the United States:

Payments from Treasury to remain a charge against Indians.

*Provided,* That any amount so paid from the Treasury of the United States shall remain a charge against such tribe, and shall be deducted from any annuity, fund or appropriation hereinbefore designated which may hereafter become due from the United States to such tribe.

Judgments final.
Rev. Stat. 992, 1088.

SEC. 7. That all judgments of said court shall be a final determination of the causes decided and of the rights and obligations of the parties thereto, and shall not thereafter be questioned unless a new trial or rehearing shall be granted by said court, or the judgment reversed or modified upon appeal as hereafter provided.

List of judgments to Congress, etc.

SEC. 8. That immediately after the beginning of each session of Congress the Attorney-General of the United States shall transmit to the

B. FIFTY-FIRST CONGRESS.   SESS. II.   CH. 538.   1891.

Congress of the United States a list of all final judgments rendered in pursuance of this act, in favor of claimants and against the United States, and not paid as hereinbefore provided, which shall thereupon be appropriated for in the proper appropriation bill.

SEC. 9. That all sales, transfers, or assignments of any such claims heretofore or hereafter made, except such as have occurred in the due administration of decedent's estates, and all contracts heretofore made for fees and allowances to claimants' attorneys are hereby declared void.

*Sales and attorneys' contracts declared void.*

And all warrants issued by the Secretary of the Treasury, in payment of such judgments, shall be made payable and delivered only to the claimant or his lawful heirs, executors or administrators or transferee under administrative proceedings, except so much thereof as shall be allowed the claimant's attorneys by the court for prosecuting said claim, which may be paid direct to such attorneys, and the allowances to the claimant's attorneys shall be regulated and fixed by the court at the time of rendering judgment in each case and entered of record as part of the findings thereof;

*Warrants for judgment to be payable and delivered to claimants, except amount allowed attorneys.*

But in no case shall the allowance exceed fifteen per cent. of the judgment recovered, except in case of claims of less amount than five hundred dollars, or where unusual services have been rendered or expenses incurred by the claimant's attorney, in which case not to exceed twenty per cent. of such judgment shall be allowed by the court.

*Maximum allowance to attorneys.*

SEC. 10. That the claimant, or the United States, or the tribe of Indians, or other party thereto interested in any proceeding brought under the provisions of this act, shall have the same rights of appeal as are or may be reserved in the Statutes of the United States in other cases, and upon the conditions and limitations therein contained. The mode of procedure in claiming and perfecting an appeal shall conform, in all respects, as near as may be, to the statutes and rules of court governing appeals in other cases.

*Appeal.
R. S. 707, 708.*

SEC. 11. That all papers, reports, evidence, records and proceedings now on file or of record in any of the departments, or the office of the Secretary of the Senate, or the office of the Clerk of the House of Representatives, or certified copies of the same, relating to any claims authorized to be prosecuted under this act, shall be furnished to the court upon its order, or at the request of the Attorney-General.

*Papers, etc., in Departments and before Congress to be furnished the court.
R. S. 1074.*

SEC. 12. To facilitate the speedy disposition of the cases herein provided for, in said Court of Claims, there shall be appointed, in the manner prescribed by law for the appointment of Assistant Attorney-Generals, one additional Assistant Attorney-General of the United States, who shall receive a salary of twenty-five hundred dollars per annum.

*Additional Assistant Attorney-General to be appointed.
R. S. 348.*

SEC. 13. That the investigation and examinations, under the provisions of the acts of Congress heretofore in force, of Indian depredation claims, shall cease upon the taking effect of this act, and the unexpended balance of the appropriation therefor shall be covered into the Treasury, except so much thereof as may be necessary for disposing of the unfinished business pertaining to the claims now under investigation in the Interior Department, pending the transfer of said claims and business to the Court or courts herein provided for, and for making such transfers and a record of the same, and for the proper care and custody of the papers and records relating thereto.

*Investigation under acts heretofore in force to cease.*

*March 3, 1891.*

See Revised Statutes, 446, 448, 2388, 3156, 3157, and the acts cited in the following note.

The provision referred to in the act of 1885, March 3, chapter 41, 23 Stat. 376, is as follows:

"Indian depredation claims:  For the investigation of certain Indian depredation claims, ten thousand dollars; and in expending said sum the Secretary of the Interior shall cause a synopsis of all claims heretofore filed in the Interior Department and which have been examined, approved, or allowed or now remain unsettled, and . . .

*Indian depredations.
Secretary of Interior to make list of claims pending and report to Congress.*

IRS.

t, any tes-
, and such
the courts.
rt as con-
dgment is

een exam-
or under
ppropria-
n Depart-
an tribes,
ighty-six,
ndred and
have pri-

rendered,
to re-open
the testi-
evidence,
d as depo-

all assume

ations for
osition or
where the

party to
at may be

property
struction,
whom the
or of the
the tribe
d.
inst any
ch, or by
was consi-
er:
st
any other
e sale of

ny appro-
tions for
on:
s due or
from the

e United
deducted
esignated
ich tribe,
etermin-
f the par-
new trial
reversed

t of Con-
mit to the